**NATIONAL STEEL CORPORATION**
v.
**The UNITED STATES.**
No. 172–60.

United States Court of Claims.
July 15, 1966.

William T. Hannan, Washington, D. C., attorney of record, for plaintiff; Hannan, Castiello & Berlow, Washington, D. C., John E. Laughlin, Jr., Charles Weiss, and Thorp, Reed & Armstrong, Pittsburgh, Pa., of counsel.

Gilbert W. Rubloff, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant; Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, and COLLINS, Judges.

PER CURIAM:*

The plaintiff's motion and the defendant's cross-motion for partial summary judgment both relate to count III of the petition. The petition originally contained five counts. Counts I, II, and V have been disposed of heretofore, and an understanding has been reached between the parties and the trial commissioner with respect to the disposition of count IV. Therefore, action by the court is required only in connection with count III of the petition.

In count III, the plaintiff, National Steel Corporation, seeks to recover refunds of income taxes previously paid for the calendar years 1951, 1952, 1953, 1954, and 1955. The legal issue involved in this count is whether the plaintiff was entitled to a percentage depletion allowance for each of these years with respect to coal which was produced by the Weirton Coal Company, a wholly owned subsidiary of the plaintiff, and delivered to the plaintiff at cost for use by the plaintiff in its iron and steel manufacturing plants.

The plaintiff is a corporation organized and existing under the laws of the State of Delaware. It is engaged in the business of managing and operating integrated iron and steel manufacturing plants, coal and iron ore properties, and freighters on the Great Lakes. The principal office is located in Pittsburgh, Pennsylvania.

The plaintiff was organized in 1929. The following year, the plaintiff acquired the complete ownership of another corporation, the Weirton Steel Company, which at the time owned and operated iron and steel manufacturing plants at Weirton, West Virginia, and Steubenville, Ohio, and which continued to operate such plants as a wholly owned subsidiary of the plaintiff until May 31, 1939, when the Weirton Steel Company was liquidated and dissolved. Since the dissolution of the Weirton Steel Company, the iron and steel manufacturing plants have been operated directly by the plaintiff through an organizational unit that is commonly known as the Weirton Steel Company Division.

The Weirton Coal Company was originally organized on January 14, 1920, as a Pennsylvania corporation under the name of "Redstone Coal and Coke Company," with an authorized capital stock of $1,500,000, divided into 15,000 shares having a par value of $100 per share. A large block of this stock was initially subscribed for and issued to the Weirton Steel Company. By October 1922, the Weirton Steel Company had purchased the interests of all the other sharehold-

---

* This opinion incorporates, with slight changes and some added discussion, the opinion prepared, at the direction of the court under Rule 54(b), by Trial Commissioner Mastin G. White.

ers, and the Redstone Coal and Coke Company became a wholly owned subsidiary of the Weirton Steel Company. The purpose of the Weirton Steel Company in acquiring the 100-percent ownership of the Redstone Coal and Coke Company was to help assure a supply of coal needed in the former's operations. On July 12, 1929, the name of the coal company was changed to Weirton Coal Company.

With the dissolution of the Weirton Steel Company at the end of May 1939, the plaintiff acquired the direct ownership of all the outstanding shares of stock issued by the Weirton Coal Company, and the latter operated thereafter as a wholly owned subsidiary of the plaintiff. The parties have stipulated that the plaintiff continued the Weirton Coal Company in existence for valid business reasons. During the period (1951–1955), involved in the present proceeding, the Weirton Coal Company had 12,300 shares of common stock outstanding, each share having a par value of $100, and the plaintiff owned all of these shares of stock.

On January 6, 1920, shortly before the Redstone Coal and Coke Company (later the Weirton Coal Company) was organized, the Weirton Steel Company and one E. W. Mudge entered into an agreement with the Thompson-Connellsville Coke Company to purchase the latter's No. 1 Mine, consisting of 500 acres of coal lands, buildings, and improvements, for the sum of $2,500,000. This contract was then assigned to the Redstone Coal and Coke Company, which completed the purchase, paying $750,000 in cash and giving a purchase money mortgage in the amount of $1,750,000 for the balance. The Thompson-Connellsville No. 1 Mine was worked by the Redstone Coal and Coke Company until 1929, when it was exchanged, as indicated subsequently in this opinion.

In January of 1926, the Redstone Coal and Coke Company acquired 1,000 acres of coal lands adjoining property already owned by the company, for a purchase price of $1,600,000. In order to provide funds for this purchase and to pay off the balance of the purchase money mortgage on the Thompson-Connellsville No. 1 Mine, the Redstone Coal and Coke Company borrowed $2,000,000 from the Fidelity Title & Trust Company (now part of the Pittsburgh National Bank), secured by a mortgage upon all of the coal lands then owned by the coal company and guaranteed by that company's parent corporation, the Weirton Steel Company. As previously indicated, the name of the Redstone Coal and Coke Company was changed to Weirton Coal Company on July 12, 1929.

In July 1929, the Weirton Coal Company entered into an agreement with the Tower Hill Connellsville Coke Company to exchange the Thompson-Connellsville No. 1 Mine, which then contained about 185 acres of unmined coal, for approximately 185 acres of unmined coal adjoining a property of the Hecla Coal & Coke Company known as the Isabella Tract. In addition, the Weirton Coal Company purchased 48.5 acres of adjacent coal land from the Tower Hill Connellsville Coke Company for $97,000 in cash, arranged for and guaranteed by the Weirton Steel Company. At about the same time, the Weirton Coal Company purchased from the Hecla Coal & Coke Company the latter's Isabella Mine, consisting of approximately 1,220 acres of unmined coal and certain surface lands, buildings, equipment, and a company town, for the sum of $3,558,700. In order to obtain funds for this acquisition, the Weirton Coal Company borrowed $3,500,000 from the Fidelity Title & Trust Company, secured by a mortgage on all of its properties and guaranteed by the Weirton Steel Company. At the same time, the Weirton Coal Company borrowed $1,052,581.31 from the Weirton Steel Company, and it used the proceeds of both loans to complete the purchase of the Isabella Mine and to pay off fully the 1926 bank debt of $2,000,000, which had been reduced in the meantime to $1,733,104.37. After these acquisitions the coal properties of the

Weirton Coal Company were known collectively as the Isabella Mine.

In July 1934, the Weirton Coal Company acquired from the plaintiff (which at the time was the parent corporation of the coal company's parent corporation, the Weirton Steel Company), 993 acres of coal in a tract which adjoined the Isabella Mine and was known as the National Tract. The purchase price of $1,981,-683.85, which was the actual cost of the property to the plaintiff, was paid by the Weirton Coal Company in interest-bearing notes, given to and held by the plaintiff.

Thereafter, in May 1935, the Weirton Coal Company issued demand mortgage bonds in the total face amount of $4,216,-000 to the plaintiff to cover (1) an advance by the plaintiff in the amount of $2,216,000, which was used by the Weirton Coal Company to pay off the unpaid balance of its $3,500,000 bank debt, and (2) $2,000,000 to cover the open account and notes payable owed to the plaintiff by the Weirton Coal Company. This bonded indebtedness of the Weirton Coal Company, secured by a mortgage on all of its coal properties and other assets, has remained unpaid to the present time.

Subsequent to the acquisition of the National Tract in July 1934, the Weirton Coal Company made two substantial purchases of coal lands, namely, the Husted-Seamans Tract and the Melrose Mine, and a number of smaller acquisitions to fill in and round out existing holdings. All of these acquisitions, and all other major improvements to the Weirton Coal Company's properties, were made with funds advanced by the plaintiff to the Weirton Coal Company on open account or interest-bearing notes.

On or about October 1, 1938, the Weirton Steel Company entered into a contract with the Weirton Coal Company. That contract provided in pertinent part as follows:

1. Weirton Coal Company will supply to Weirton Steel Company such quantities of cooking coal as Weirton Steel Company shall, from time to time, need and request, within the production limits of Weirton Coal Company; and Weirton Steel Company will reimburse Weirton Coal Company therefor in the manner hereinafter provided.

2. Weirton Coal Company will, as soon as it may be convenient after the last day of each month, debit Weirton Steel Company for the coal supplied during such month, at an aggregate price which shall be sufficient to reimburse Weirton Coal Company for the cost of maintaining and operating its mines during each month * * *.

The term "cost" as used in this agreement, shall mean the entire cost of maintaining and operating its mines during the month, including, without limitation, the following:

(a) Operating and administrative costs and expenses, of every kind and character;

* * * * * *

(e) Reasonable charges for depreciation and depletion, which shall not be in excess of the charges from time to time approved by the Bureau of Internal Revenue; and

(f) Such other costs and expenses as the parties hereto may deem appropriate for the purpose of computing the entire cost of operating the mine during the month.

* * * * * *

3. If, at any time, Weirton Steel Company shall not require, Weirton Coal Company may sell or otherwise dispose of such quantities of coal as may not be required by Weirton Steel Company, upon such terms and at such prices as Weirton Coal Company may deem proper, provided that any amounts which may be received by Weirton Coal Company from any such sales shall be credited against the cost billed to Weirton Steel Company for the month during which such sales may have occurred.

4. In consideration of the agreement of Weirton Coal Company to make its entire output of coal available to Weirton Steel Company, if re-

quired by the latter, Weirton Steel Company agrees that it will reimburse Weirton Coal Company for any losses which it may incur in maintaining or operating its mines under this agreement. * * *

5. If, from time to time, it shall appear that the cost of maintaining and operating the mines under the terms of this agreement, during any period or periods, was, for any reason, less than the amounts billed to Weirton Steel Company for such period or periods, Weirton Coal Company will credit to Weirton Steel Company the excess of the amounts billed over actual cost and will make such adjustments (either in subsequent billings or otherwise) as the parties hereto may deem appropriate for the purpose of giving effect to such credit * * *.

When the Weirton Steel Company was liquidated and dissolved at the end of May 1939, all of its assets, including this 1938 contract were assigned to the plaintiff, as the sole stockholder of the Weirton Steel Company. Thereafter the plaintiff and the Weirton Coal Company continued to operate under the 1938 contract until May 31, 1956.

Beginning with the year 1938 and continuing through the period (1951–1955) involved in the present proceeding, the entire output of the Weirton Coal Company was delivered to the plaintiff, which used the coal in its manufacturing processes, except that the coal company delivered a relatively low tonnage to the Donner-Hanna Coal Corporation (a 50-percent subsidiary of the plaintiff) in 1948, made some special emergency deliveries on Government allocations under production controls during and after World War II, and made local sales to employees for domestic purposes under a union contract. Any proceeds (including any profits) from sales to persons other than the plaintiff were posted as a credit against costs to the plaintiff.

The plaintiff's blast-furnace operations for the production of pig iron required a continuous supply of large quantities of metallurgical coal (i. e., coal that has the chemical and physical properties essential for the production of blast-furnace coke of good quality). By far the largest part of this coal is moved to the plaintiff's plants from the coal-producing areas of western Pennsylvania in barges on the Monongahela and Ohio Rivers. Since 1938, the plaintiff has followed the practice of using only washed coal for coking, because washing eliminates the high-ash material and some of the sulphur material. To avoid losses in production resulting from coal shortages caused by river conditions (e. g., flood or freezing), labor disputes, and similar events, a 35 to 60 days' supply of coal is maintained in stockpiles at the coke ovens.

For many years, except for periods of temporary emergencies, the plaintiff obtained almost all of its metallurgical coal from the Isabella Mine. This was true during the years (1951–1955) involved in the present proceeding.[1]

The procedure for determining how much coal would be produced at the Isabella Mine was as follows: About 10 days before the first of the month, the Executive Vice President of the plaintiff's Weirton Steel Company Division, who was in charge of all outside purchases of coal, met with the Vice President in Charge of Operations of the Weirton Steel Company Division and they jointly determined the amount of coal that would be required from the Isabella Mine during the following month, taking into account the amount of coal in the stockpiles, the amount expected from outside suppliers, and the anticipated quantity of coke production. The production quota thus fixed was communicated to the Weirton Coal Com-

[1] During the last 5 years, the plaintiff has secured from 70 to 75 percent of its requirements by purchase from outside sources, because of the plaintiff's increased production of coke and a corresponding diminution in the coal reserves available from the Isabella Mine.

pany's manager of the Isabella Mine, with instructions to schedule his operations to meet the quota.

The coal mined in the Isabella Mine was put through the Weirton Coal Company's cleaning plant and was then loaded into the plaintiff's barges. Transportation from the mine to the stockpiles at the plaintiff's manufacturing plants was handled by a carrier under contract with the plaintiff.

The coal from the Isabella Mine was delivered to the plaintiff at cost, pursuant to the terms of the 1938 contract previously mentioned. This cost was determined on a monthly basis in the following manner: The Weirton Coal Company's Accounting Department reported to the plaintiff's Weirton Steel Company Division the cost during the particular month of electric power and of all materials, and the hourly wages and salaries of the coal company's clerical supervisory employees up to the rank of general foreman. The Cost Department of the plaintiff's Weirton Steel Company Division then calculated the total cost of the coal during such month by adding to the factors reported by the Weirton Coal Company other items of cost, such as other salaries, management charges, workmen's compensation, general insurance, taxes, legal expenses, pensions, group insurance and welfare benefits, cost depletion, depreciation, and other miscellaneous items of income and expense. The total cost of the coal, thus calculated, was set up on the plaintiff's books as an account payable to the Weirton Coal Company.

Since the Weirton Coal Company did not actually need cash in the full amount of its operating costs, the accounts payable mentioned in the preceding paragraph were rarely paid in full. The non-cash costs, i. e., depletion and depreciation, were allowed to accumulate. Enough cash was turned over to the Weirton Coal Company to meet its actual needs, and any balances were applied to reduce the open account indebtedness (if any) of the Weirton Coal Company to the plaintiff, or the balances were al-

lowed to accumulate. At the end of the year, the 12 monthly statements were accumulated and a final cost calculation was made to correct the estimated charges, etc. During the years 1951–1955, the open account due from the plaintiff to the Weirton Coal Company, resulting from purchases of coal, exceeded at all times the balance due from the Weirton Coal Company to the plaintiff. The open accounts bore interest on their average monthly balance at current interest rates. Interest paid by the plaintiff to the Weirton Coal Company on these accounts was deducted as interest expense by the plaintiff on its income tax returns, and was included in gross income on the returns of the Weirton Coal Company.

The Weirton Coal Company's books of summary entry were kept by employees of the plaintiff's Weirton Steel Company Division, who also prepared all financial statements. In order to include these administrative expenses in the total cost of coal, a portion of the salary of the plaintiff's president was allocated to the Weirton Coal Company.

At times, the cost of the coal which the plaintiff obtained from the Weirton Coal Company was higher than the outside market price for coal of the same character, and at times the cost of the coal obtained from the Weirton Coal Company was lower than the outside market price. The reason why coal was obtained by the plaintiff from the Weirton Coal Company even when the cost of producing it was above the market price for similar coal was that it was deemed better to continue to operate the Isabella Mine even though outside coal was cheaper, because an idle mine is costly to protect and maintain.

On its Federal income tax returns for the years 1938 through 1950, the Weirton Coal Company claimed deductions for cost depletion with respect to coal mined and sold to the plaintiff at cost pursuant to the terms of the 1938 contract. The plaintiff did not claim any depletion allowance on its Federal income tax returns with respect to this coal. On au-

dit of the returns of the Weirton Coal Company for the years 1938–1950, the Internal Revenue Service allowed the deductions claimed by the coal company for cost depletion with respect to the coal mined by it and delivered at cost to the plaintiff pursuant to the terms of the 1938 contract. During the period 1938–1950, the cost depletion claimed by the Weirton Coal Company and allowed by the Internal Revenue Service exceeded the percentage depletion allowance of 5 percent which the plaintiff, under the theory advanced in the present case, might have claimed for those years pursuant to the pertinent provisions of the Internal Revenue Code of 1939.

On its Federal income tax returns for the years 1951 through 1955 (the years involved in the present litigation), the Weirton Coal Company claimed deductions for cost depletion with respect to the coal mined by it and sold to the plaintiff at cost pursuant to the terms of the 1938 contract. Each of these deductions for cost depletion claimed by the Weirton Coal Company was less than the percentage depletion allowance of 10 percent that was permitted by the then-current provisions of the Internal Revenue Code with respect to coal. The plaintiff, on its Federal income tax returns for the years 1951–1953 and by claims for refund filed for the years 1954–1955, also claimed an additional deduction for depletion with respect to this coal, in an amount representing the difference between the statutory percentage depletion allowance of 10 percent and the cost depletion already claimed by the Weirton Coal Company. On audit, the Internal Revenue Service allowed the deductions claimed by the Weirton Coal Company for cost depletion, but disallowed the additional depletion deduction claimed by the plaintiff. The plaintiff paid the resulting deficiencies, filed timely claims for refunds, and brought this timely suit for refunds of the resulting deficiencies, plus interest.

On May 31, 1956, the plaintiff, which had previously owned 40 percent of the stock of the Renton Coal Company, acquired the remaining 60 percent of that company's stock from the Pittsburgh Consolidation Coal Company (now the Consolidation Coal Company). On the same date, the Weirton Coal Company was merged into the Renton Coal Company in a statutory merger (which qualified as a nontaxable reorganization under the Internal Revenue Code of 1954), and the Renton Coal Company changed its name to National Mines Corporation.

Prior to May 31, 1956, the Renton Coal Company had sold coal to the plaintiff at the same current market prices which the Renton Coal Company charged other customers. From the date of the merger of the Weirton Coal Company into the Renton Coal Company and the change of the name of the resulting corporation to National Mines Corporation, up until the present time, the coal produced by the National Mines Corporation has been sold to the plaintiff at current market prices.

The National Mines Corporation has filed separate income tax returns, and in each return has claimed a deduction for percentage depletion based on the sale price of the coal.

The 1938 contract was never terminated formally, but was terminated by administrative action at the time of the merger on May 31, 1956. Since that date, there has been no formal contract covering the purchase of coal by the plaintiff from the National Mines Corporation, but it has been the plaintiff's practice to take all the output of the Isabella Mine and almost all the output of the Renton Mine (which was owned by the Renton Coal Company prior to the merger).

During the earlier part of the period (1951–1955) that is involved in the present litigation, the pertinent provisions of law relating to the subject of percentage depletion with respect to coal were Section 23(m) of the Internal Revenue Code of 1939 (53 Stat. 12, 14) and Section 114(b) (4) of the 1939 Code, as amended by Section 319(a) of the Revenue Act of 1951 (65 Stat. 452, 497).

Section 23(m) of the 1939 Code provided in part as follows:

SEC. 23.  DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

*   *   *   *   *   *

(m) DEPLETION.—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. *   *   *

Section 114(b) (4) of the 1939 Code, as amended, provided in part as follows:

(4) PERCENTAGE DEPLETION FOR COAL AND METAL MINES AND FOR CERTAIN OTHER MINES AND NATURAL MINERAL DEPOSITS.

(A) IN GENERAL.—The allowance for depletion under section 23(m) in the case of the following mines and other natural deposits shall be—

*   *   *   *   *   *

(ii) In the case of coal, *   *   *

10 per centum[.]

For the latter part of the period that is involved in the present case, the provisions of law previously quoted were superseded by Sections 611(a) and 613 (a) and (b) of the Internal Revenue Code of 1954 (68A Stat. 207, 208).

Section 611(a) of the 1954 Code provides in part as follows:

SEC. 611.  ALLOWANCE OF DEDUCTION FOR DEPLETION.

(a) GENERAL RULE.—In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by

the Secretary or his delegate. *   *   *
Section 613(a) and (b) of the 1954 Code provides in part as follows:

SEC. 613.  PERCENTAGE DEPLETION

(a) GENERAL RULE.—In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. *   *   *

(b) PERCENTAGE DEPLETION RATES.— The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows:

*   *   *   *   *   *

(4) 10    percent—  *   *   *  coal *   *   *.

██  Depletion allowances with respect to the production of minerals are allowed by the Congress as an act of grace (Helvering v. Bankline Oil Co., 303 U.S. 362, 366, 58 S.Ct. 616, 82 L.Ed. 897 (1938)), and in recognition of the fact that mineral deposits are wasting assets (Parsons v. Smith, 359 U.S. 215, 220, 79 S.Ct. 656, 3 L.Ed.2d 747 (1959)). Such allowances are intended as compensation for the capital assets consumed in the production of income through the severance of the minerals (Anderson v. Helvering, 310 U.S. 404, 408, 60 S.Ct. 952, 84 L.Ed. 1277 (1940)), so that when the minerals are gone, the capital and capital assets of the persons having interests in the mineral deposits remain unimpaired (Paragon Coal Co. v. Commissioner, 380 U.S. 624, 631, 85 S.Ct. 1207, 14 L.Ed.2d 116 (1965)).

██  The legal title to the mineral deposit involved in a particular case is not essential (Lynch v. Alworth-Stephens Co., 267 U.S. 364, 370, 45 S.Ct. 274, 69 L.Ed. 660 (1925)) and may not even be important (Kirby Petroleum Co. v. Commissioner, 326 U.S. 599, 603, 66 S.Ct. 409, 90 L.Ed. 343 (1946)) in determining whether a taxpayer is entitled to

a depletion allowance with respect to production from such deposit. The law of depletion requires an economic, rather than a legal, interest in the mineral deposit (Commissioner v. Southwest Exploration Co., 350 U.S. 308, 316, 76 S.Ct. 395, 100 L.Ed. 347 (1956)).

Therefore, when a taxpayer claims a depletion allowance, the test is whether the taxpayer has an economic interest in the particular mineral deposit that has been depleted. Only a taxpayer with an economic interest in the asset is entitled to the depletion allowance (Kirby Petroleum Co. v. Commissioner, supra, 326 U.S. at 603, 66 S.Ct. 409). Conversely, it is a sufficient foundation for the successful assertion of a claim for a depletion allowance if the taxpayer does have an economic interest in the mineral deposit which has been depleted by production (Helvering v. Bankline Oil Co., supra, 303 U.S. at 367, 58 S.Ct. 616.)

In this connection, the Supreme Court has cautioned on several occasions that it is an economic interest in the mineral deposit, and not a mere economic advantage derived under contract from production of the mineral, that entitles a taxpayer to the depletion allowance (Helvering v. Bankline Oil Co., supra, 303 U.S. at 367–368, 58 S.Ct. 616; Helvering v. O'Donnell, 303 U.S. 370, 372, 58 S.Ct. 619, 82 L.Ed. 903 (1938); Parsons v. Smith, supra, 359 U.S. at 224, 79 S.Ct. 656; Paragon Coal Co. v. Commissioner, supra, 380 U.S. at 634–635, 85 S.Ct. 1207).

The requirement of an economic interest is met if the taxpayer has (1) acquired by investment any interest in the mineral deposit and (2) secured by legal relationship income derived from the extraction of the mineral, to which the taxpayer must look for a return of his capital (Palmer v. Bender, 287 U.S. 551, 557, 53 S.Ct. 225, 77 L.Ed. 489 (1933); Commissioner v. Southwest Exploration Co., supra, 350 U.S. at 313–314, 76 S.Ct. 395). Both of these factors are essential. Hence, if the taxpayer

who claims a depletion allowance does not have a capital investment in the mineral deposit which suffered depletion, he is not entitled to the allowance (Helvering v. Bankline Oil Co., supra, 303 U.S. at 368, 58 S.Ct. 616; Kirby Petroleum Co. v. Commissioner, supra, 326 U.S. at 603, 66 S.Ct. 409; Parsons v. Smith, supra, 359 U.S. at 226, 66 S.Ct. 409). With respect to the second of the two factors mentioned, it has been held that the taxpayer must look solely to the extraction of the mineral from the deposit for the return of his capital in order to qualify for the depletion allowance (Kirby Petroleum Co. v. Commissioner, supra, 326 U.S. at 603–604, 66 S.Ct. 409; Commissioner v. Southwest Exploration Co., supra, 350 U.S. at 314, 76 S.Ct. 395; Paragon Coal Co. v. Commissioner, supra, 380 U.S. at 635, 638, 85 S.Ct. 1207).

The Supreme Court has said, with respect to depletion, that the tax law deals in economic realities and not in bare legal abstractions (Commissioner v. Southwest Exploration Co., supra, 350 U.S. at 315, 76 S.Ct. 395) or in fictions (Parsons v. Smith, supra, 359 U.S. at 225, 79 S.Ct. 656). When the facts of the present case are studied, it seems to us plain that, considered realistically, they show the existence during the period 1951–1955 of an economic interest on the part of the plaintiff in the coal deposits that collectively made up the Isabella Mine, out of which came the production that is involved in this litigation.

In the first place, the Coal Company subsidiary was a "cost company", wholly owned and controlled by the plaintiff and owing its entire life and activity to plaintiff. The Isabella Mine was obtained with funds and credit provided by the plaintiff (or by the Weirton Steel Company, in whose place the plaintiff now stands). It is clear that the plaintiff, as a matter of actual fact, had a capital investment in the Isabella Mine during the period 1951–1955. In this connection, it is significant that the sole motivation for the making of

such a capital investment was to obtain an economic interest in the coal deposits themselves, as the coal from such deposits, being of a metallurgical grade, was needed and was to be used in connection with the manufacturing processes for the production of iron and steel.

Furthermore, during the period (1951-1955) that is involved in this case, the plaintiff looked to the extraction of coal from the Isabella Mine—and only to that source—for the return of its capital invested in the mine. Since the sole purpose in making a capital investment in the Isabella Mine was to obtain a supply of metallurgical coal needed for the manufacture of iron and steel, the plaintiff exercised complete control during this period over the production of coal from the mine, so that no coal was produced from the mine during the 5-year period except on instructions issued by the plaintiff. The plaintiff needed, and directed the delivery of, the entire output of the Isabella Mine during this period to itself for use in its manufacturing processes (except for some local sales to mine employees under a union contract, and the proceeds from such sales were posted as a credit against costs to the plaintiff). In this way, the plaintiff obtained from the Isabella Mine virtually all of the metallurgical coal that was needed by the plaintiff's manufacturing plants during 1951–1955. No other form of financial benefit was derived by the plaintiff during 1951–1955 from its capital investment in the Isabella Mine. The Coal Company was a "cost company"; the plaintiff could not recover its investment through dividends and probably not through the sale of the coal in fee to third parties.

It is true that the plaintiff utilized the device of a wholly owned corporate subsidiary to hold the legal title to the Isabella Mine, but, as previously indicated, this factor is not critical in determining whether the plaintiff, though technically not the legal owner of the mine, had an economic interest in the coal deposits (Kirby Petroleum Company v. Commissioner, supra, 326 U.S. at 603, 66 S.Ct. 409). The Internal Revenue Service has itself recognized, in a depletion ruling, that stockholding parent companies can have an economic interest in ores technically owned by a captive, cost, mining company, which is a subsidiary. Rev.Rul. 56–542, 1956–2 Cum. Bull. 327.[2] Defendant relies upon Helvering v. O'Donnell, supra, 303 U.S. 370, 58 S.Ct. 619, 82 L.Ed. 903, and National Carbide Corp. v. Commissioner, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949), but neither decision is apposite. *O'Donnell* involved a claim of an economic interest by an individual who had owned only one-third of the stock of an oil corporation which was not a cost company; the taxpayer here, in contrast, was the 100-percent owner of the stock of a cost company. *National Carbide* was not a depletion case and did not concern the concept of economic interest; moreover, unlike the present situation, the subsidiaries were not cost companies (or recognized by the Internal Revenue Service as such), but were, rather, treated and charged as income-earning companies.

■ Defendant also suggests that plaintiff inconsistently changed its method of taking depletion solely in order to get higher or duplicating benefits. We do not find this to be so. The Coal Company, as a cost company, took cost depletion from 1938 to 1956 (which was passed on to plaintiff through the operating agreement as part of the cost of the coal), but up to 1951 the allowance for percentage depletion was only 5 percent and that allowance was less than the amount of cost depletion. In those circumstances the plaintiff would obviously not choose to take depletion on the percentage basis. Beginning with 1951, Congress raised the percentage to 10 percent; this made the percentage allowance greater for the first time, and

**2.** In that instance, there were several parent-stockholders, but the principle seems equally applicable to a parent owning all of the cost subsidiary's stock.

plaintiff now claims on the percentage basis, but only to the extent such percentage depletion exceeds the cost depletion. When the Coal Company was merged, in 1956, into the Renton Coal Company (renamed National Mines Corporation), which was not and is not a cost company, plaintiff stopped taking percentage depletion itself; Renton has taken percentage depletion. There is no material inconsistency in approach, and no seeking of duplicate depletion allowances.

For these reasons, we hold that during the period 1951–1955 the plaintiff had an economic—i.e., depletable—interest in the coal deposits that collectively comprised the Isabella Mine, and could take percentage depletion (to the extent it exceeded cost depletion).

Accordingly, the plaintiff's motion for a partial summary judgment on count III of the petition is allowed, with the amount of the recovery to be determined in proceedings under Rule 47(c) (2), and the defendant's cross-motion for a partial summary judgment is denied.