Marion L. BRISCOE and Elizabeth Sue Briscoe

v.

The UNITED STATES.

Elsie WEGENHOFT

v.

The UNITED STATES.

Nos. 314–74, 315–74.

United States Court of Claims.

June 16, 1976.

15. *See* note 14, *supra.*

Melvin M. Engel, Houston, Tex., for plaintiff. Rudy M. Groom, Houston, Tex., atty. of record. Engel, Groom, Miglicco & Gibson, Houston, Tex., of counsel.

Joan Seitz Pate, Washington, D. C., with whom was Asst. Atty. Gen., Scott P. Crampton, Washington, D. C., for defendant. Theodore D. Peyser Jr., and Robert S. Watkins, Washington, D. C., of counsel.

Before DURFEE, Senior Judge, and NICHOLS and BENNETT, Judges.

ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF BRISCOE AND SUMMARY JUDGMENT AS TO PLAINTIFF WEGENHOFT AND PLAINTIFF BRISCOE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PLAINTIFF WEGENHOFT'S MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge.

Plaintiffs in these tax refund cases place before us the much-litigated ultimate question of whether gain realized from certain mineral payments may be characterized for income tax purposes as proceeds from the sale of capital assets,[1] or must be taken into account as ordinary income subject to an allowance for depletion.[2] In *Briscoe v. United States,* Ct.Cl. No. 314–74, the parties cross-move for partial summary judgment only since other issues remain outstanding between them. In *Wegenhoft v. United States,* Ct.Cl. No. 315–74, the parties seek disposition of the entire controversy on cross-motions for summary judgment. Because we disagree with the position ad-

---

1. Int.Rev.Code of 1954, § 1222(3), provides:

 "The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income."

2. Section 611 of the Code allows as a deduction in computing taxable income a reasonable al-

lowance for depletion of natural resources. Section 613 limits the amount of such deduction to a percentage of the gross income from the property exclusive of rents or royalties paid or incurred by the taxpayer. The maximum "percentage depletion" authorized in the case of sand and gravel is 5 percent. § 613(b)(6)(A).

vanced by the plaintiffs in each of these cases, we allow the Government's motion for partial summary judgment in No. 314–74 and its motion for summary judgment in the companion case, No. 315–74. Plaintiffs' corresponding cross-motions are denied, the petition in No. 314–74 being dismissed insofar as it claims entitlement to refund based on erroneous denial of capital gains treatment for these mineral payments, and the petition in No. 315–74 being dismissed altogether.

Plaintiffs are individuals who during their taxable years 1968 through 1970 owned in fee certain farm- and ranch-lands under which were situated extensive deposits of sand and gravel. Plaintiff Elizabeth Sue Briscoe owned 624.96 acres outright, together with an undivided one-half interest in the minerals underlying an additional 383.46 surface acres owned in fee by her mother, plaintiff Elsie Wegenhoft. By instrument styled an "option lease contract" dated July 21, 1966, plaintiff Wegenhoft as "lessor" granted to Gifford-Hill & Company, Inc., as "lessee" an exclusive option to enter into a sand and gravel lease covering the entire acreage just mentioned. The option was exercisable for 180 days by written notice to the lessor. The option lease contract specified the terms of the proposed sand and gravel lease in some detail and when Gifford-Hill exercised the option on October 20, 1966, by written notice and payment of $20,000 as an agreed "advance royalty," a species of mineral lease came into existence for a term of 4 years and for such further period as sand or gravel could be produced in paying quantities.

Paragraph 2 of the sand and gravel lease originally provided that the lessee would pay to the lessor $0.15 per cubic yard as royalty for sand and gravel removed and sold, subject to a minimum of $20,000 per year after production was commenced. Paragraph 4 went on to specify payment of an "advance royalty" in the amount of $20,-000, which would be due as previously indicated on the date the option was exercised and thereafter on the anniversary date of such exercise until operations were begun. When production commenced, paragraph 2 would become operative and supersede the advance royalty provisions of paragraph 4. Advance royalties were to be deducted from earned royalties after such commencement, but it was agreed that in no event should the lessor receive less than $20,000 per year during the life of the contract.

Paragraph 8 of the lease contained a further minimum payment provision, which stated that notwithstanding any other paragraph in the agreement, the lessee promised to pay to the lessor "by way of royalty either prepaid or actual at least $1,500 per acre for each lease acre or fraction thereof *excavated* by the lessee for the purpose of producing sand and/or gravel." [Emphasis added.] In other words, without regard to whether mineral actually was removed and sold from each acre or part of an acre excavated, a total minimum payment would be due the lessor as royalty in the amount of $1,500 times the number of acres or parts thereof excavated.[3]

On March 28, 1968, plaintiffs Wegenhoft and Briscoe, together as lessors, and Gifford-Hill as lessee, executed an amendment to the sand and gravel lease. The term was extended to a total of 9 years and thereafter for so long as sand or gravel could be produced in paying quantities. Additionally, the parties agreed in amending paragraph 2 that the base price for mineral removed and sold, $0.15, would prevail only until January 1, 1975, whereupon the royalty rate would be adjusted to equal a percentage of the sale price prevailing for cal-

---

**3.** This provision we think of sufficient importance to set it out in full here:

"Anything in this contract to the contrary notwithstanding, it is hereby agreed that the Lessee herein will pay to the Lessor herein by way of royalty either prepaid or actual, at least Fifteen Hundred ($1,500.00) Dollars per acre for each lease acre or a fraction thereof which is excavated by Lessee for the purpose of producing sand and/or gravel. On the termination of this lease for any cause, Lessee will survey that portion of the land actually excavated. Should earned royalties be less than $1,500.00 times the number of excavated acres then Lessee will pay the Lessor the amount due."

endar year 1974. The amendment provided for revision of this production royalty on each 5-year anniversary date after January 1, 1975, for so long as the lessee might continue operations on the lessors' property. At no time, however, would the royalty be less than $0.15 per cubic yard. Paragraph 4 of the lease was altered so that beginning October 31, 1968, advance royalty payments would be raised to $50,000 per year, with all earned royalties from the sale of sand or gravel in excess of $50,000 per year to be credited to advance royalties paid to that date by the lessee. From and after October 31, 1975, the lessors would receive royalty only on 50 percent of all production from the sale of sand or gravel each year, in no event, however, to fall below $50,000 per year from the date of amendment, October 31, 1968. The amended lease retained without change the minimum royalty provision set out in paragraph 8 of the original lease.[4]

As stated, in these cases we deal with taxpayers' taxable years 1968, 1969, and 1970. During each of those years the record reveals that the taxpayers received and apportioned ratably between them the $50,000 advance royalty only, the lessee not then having gone into production on the lessors' property. Accordingly, under paragraph 8 of the original and amended lease during the disputed years there was no occasion to calculate the minimum royalty that might otherwise have become due to the taxpayers by reference to the amount of land excavated. On these facts taxpayers seek to characterize their royalty receipts as the proceeds of a sale of sand and gravel in place. Defendant resists this approach, urging upon us the position that at no time did the taxpayers dispose of their entire economic interest in a manner as would allow them to take these payments into account as capital gain.[5]

■ The solution to these cases depends upon the correct answer to the question of whether the taxpayers in the above-described transactions consummated a sale of sand and gravel in place to Gifford-Hill.[6] It has long been settled in cases such as this that a "sale" does not take place for purposes of section 1222 where, incident to the transaction viewed in its totality, the transferor stops short of entirely alienating his property and retains what has come to be known as an "economic interest" therein. *Burnet v. Harmel,* 287 U.S. 103, 107, 53 S.Ct. 74, 77 L.Ed. 199 (1932); *Palmer v. Bender,* 287 U.S. 551, 556–57, 53 S.Ct. 225, 77 L.Ed. 489 (1933). The general rule is well stated in *Hartman Tobacco Co. v. United States,* 471 F.2d 1327, 1328 (2d Cir. 1973):

> The mining of natural resources is not usually considered to be a severance and sale of capital assets warranting capital gains treatment. In such situations, the taxpayer will ordinarily retain an economic interest in the resources and the transaction will not amount to a sale. Broadly speaking, the taxpayer will retain an economic interest in the resources if the consideration he receives is tied to the production of the resource. However, a taxpayer can receive capital gains treatment if there is a complete and total alienation of his entire interest.

*See also, e. g., Laudenslager v. C. I. R.,* 305 F.2d 686, 690 (3d Cir. 1962), *cert. denied,* 371 U.S. 497, 83 S.Ct. 501, 9 L.Ed.2d 497 (1963). One court has gone so far as to say that whenever a landowner enters into a "typical" mineral lease with another for the purpose of exploiting natural deposits, there is a reservation of the economic interest in minerals in place and therefore no sale. *Wood v. United States,* 377 F.2d 300, 305 (5th Cir.), *cert. denied,* 389 U.S. 977, 88 S.Ct. 465, 19 L.Ed.2d 472 (1967).

■ In *Palmer v. Bender, supra,* the Supreme Court first identified the elements of an economic interest:

---

4. See note 3, *supra,*

5. This contention accords generally with the view of the Internal Revenue Service as set forth in Rev.Rul. 69–466, 1969–2 Cum.Bull. 140.

6. The Government has chosen not to deny that the sand and gravel in place occupied the category of "capital asset" within the meaning of section 1221.

\* \* \* The language of the statute is broad enough to provide \* \* \* for every case in which the taxpayer has acquired, by investment, any interest in the \* \* \* [mineral] in place, and secures, by any form of legal relationship, income derived from the extraction of the \* \* \* [mineral], to which he must look for a return of his capital. [287 U.S. at 557, 53 S.Ct. at 226.]

The issue in *Palmer* was whether the taxpayer was entitled to a percentage depletion allowance, and not whether capital gains treatment could be accorded to the proceeds of a mineral lease. But since that time courts have recognized that the economic interest concept provides the frame of reference in both lines of decisions. *E. g., Wood v. United States, supra* at 305, and cases cited therein. As distilled in the authorities in this and in other courts, the test of whether a taxpayer is possessed of an economic interest is whether the taxpayer (1) by legal relationship has acquired an interest in the minerals in place, and (2) must look *solely* to the extraction of the mineral for a return of capital. *Commissioner of Internal Revenue v. Southwest Expl. Co.,* 350 U.S. 308, 314, 76 S.Ct. 395, 100 L.Ed. 347 (1956); *Anderson v. Helvering,* 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277 (1940); *Helvering & Elbe Oil Land Dev. Co.,* 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904 (1938); *Food Mach. & Chem. Corp. v. United States,* 366 F.2d 1007, 1009, 177 Ct.Cl. 219, 223 (1966); *National Steel Corp. v. United States,* 176 Ct.Cl. 952, 967, 364 F.2d 375, 383 (1966); *Handelman v. United States,* 357 F.2d 694, 702, 174 Ct.Cl. 1042, 1055 (1966).[7]

■ The taxpayers do not dispute that prior to the transactions outlined herein they possessed an investment in the mineral in place—the first element of an economic interest. However, they deny that after the various agreements took effect, payments thereunder necessarily would come solely from the extraction of sand and gravel. Taxpayers draw our attention first to the requirement of a minimum annual royalty, either actual or advance, of $20,000 (later amended to $50,000). They argue that since these payments would be and were in fact forthcoming without regard to whether a single cubic yard of mineral ever was extracted, their payments were not realized *solely* from the extraction of the minerals in question. We need not be detained by this position, however, since the Supreme Court already has authoritatively disapproved it in *Burnet v. Harmel, supra,* 287 U.S. at 112, 53 S.Ct. 74.

More persuasively, taxpayers contend that paragraph 8 of the original and amended lease (imposing a minimum royalty calculated by reference to the number of acres excavated) impels the conclusion that they were not required to look solely to actual extraction of sand and gravel for a return of their capital. Without regard to whether or not any mineral was extracted, it is said, for each acre excavated a minimum payment of $1,500 would be made. Thus, taxpayers could look to mere excavation of land for a return, not solely to extraction.

Before stating the reasons for our disagreement with taxpayers' construction of paragraph 8, we deem it advisable to explore for a moment the decisions where it has been held that a taxpayer lacks an economic interest unless required to look solely to extraction or production of mineral for a return of investment. In *Southwest Expl. Co., supra,* this aspect of the economic interest test was not seriously disputed, 350 U.S. at 314, 76 S.Ct. 395, but the Court did refer to the *Elbe* and *Anderson* decisions as precedent therefor. In *Elbe,* the taxpayer sought a tax refund asserting that it was erroneously denied a depletion deduction. Taxpayer had conveyed oil and gas prospecting permits, drilling agreements, leases and equipment to another corporation. The grantee in return agreed to pay $350,000 on execution of their agreement, $400,000 per year for each of the years 1928 through 1930, and $450,000 for 1931. Moreover, the grantee promised to pay the taxpayer monthly one-third of the net profits resulting from production and operation. The

---

7. *See generally* W. B. Wood, *Sale v. Sublease,* 1964 N.Y.U. 22d Inst. on Fed.Tax. 1343.

agreement recited that full ownership and control of the property transferred was vested in the grantee, taxpayer having no interest therein. On these facts, the Court held that the taxpayer was not entitled to a depletion allowance, because it disposed of its entire depletable or economic interest in the mineral in place. It was said:

> * * * The aggregate sum of $2,000,-000 was paid as an agreed purchase price to which was to be added the one-third of the net profits payable on the conditions specified. We are unable to conclude that the provision for this additional payment qualified in any way the effect of the transaction as an absolute sale or was other than a personal covenant of the * * * [grantee]. * * *. [303 U.S. at 375, 58 S.Ct. at 622.]

In the later *Southwest Expl. Co.* case, the true basis of the *Elbe* decision was said to be that the payments were not "dependent on production." 350 U.S. at 314, 76 S.Ct. 395. We think the *Elbe* Court was influenced as well by the stated intent of the parties to the effect that the transaction should be regarded as having divested the taxpayer of all interest in the property and rights conveyed. 303 U.S. at 374–75, 58 S.Ct. 621. In any event, the taxpayer did not have to look *solely* to extraction for a return of capital. It looked primarily to the unconditional contractual obligation of the grantee to pay $2,000,000 for the entire package of rights and assets transferred, and then to a "personal covenant" to pay over a share of profits.

*Anderson v. Helvering, supra,* provides a more useful statement of the requirement that the holder of an economic interest in minerals looks solely to production for his return. There, two individual taxpayers acquired from a corporation certain royalty interests, fee interests, and deferred oil payments. The vendees agreed to pay a total price of $160,000 (1) $50,000 upon execution, and (2) $110,000 deferred purchase money payable with interest. The deferred purchase price was to come from two sources: (a) from one-half of the proceeds received by the vendees from production, and (b) from the proceeds of resales by the vendees of the fee interests originally conferred upon them by their vendor. During their taxable year 1932 the individual taxpayers received from production some $81,-000, one-half of which they deposited in a bank to the credit of the vendor in accordance with the agreement. The one-half so paid to the vendor the taxpayers did not report as income to them, whereupon the Commissioner assessed a deficiency. The Court agreed with the Government that the amounts so received were includible in the gross income of the vendees, saying:

> It is settled that the same basic issue determines both to whom income derived from the production of oil and gas is taxable and to whom a deduction for depletion is allowable. That issue is, who has a capital investment in the oil and gas in place and what is the extent of his interest. [Citations omitted.] [310 U.S. at 407, 60 S.Ct. at 954.]

Thus, following the basic rule that income from property is taxable to the owner thereof, the Court set about determining whether the investment in the minerals in place was in the individual taxpayer or, rather, in the corporate vendor. Observing that the vendor corporation could look beyond production for its return—to resales of fee interests by the taxpayers—it was concluded that the vendor was "not dependent entirely upon the production of oil for the deferred payments," 310 U.S. at 412, 60 S.Ct. at 956, and therefore not eligible for a depletion deduction with respect to income from such resales. Accordingly, the depletable interest and the capital investment in the minerals in place had to be situated in the individual vendees, and income derived from resales thus was includible in the gross income of those taxpayers.

The principle which the reader discovers upon examination of *Elbe* and *Anderson* does indeed appear to be that unless one looks solely to production or extraction of minerals for a return of invested capital, one has no depletable or economic interest in such minerals. The Supreme Court has reasoned in part that income generated from sources other than production, *e. g.,*

from resales of fee interests, does not necessarily result in physical depletion of the natural resources. *Anderson, supra,* 310 U.S. at 412, 60 S.Ct. 952. In such a case for tax purposes no depletion allowance is warranted. As in *Anderson,* one who looks other than solely to production for a return generally has disposed of the entire interest in minerals. Thus, the court in *Rhodes v. United States,* 464 F.2d 1307 (5th Cir. 1972), alluded to a contract term calling for a firm price of $7,500 per acre for merchantable brick clay as disuasive of the conclusion that the taxpayer looked exclusively to production for income. We declined to reduce a depletion allowance in *Food Mach. & Chem. Corp. v. United States, supra,* finding that the taxpayer's transferor in that case derived its return from payment for mining services rendered and not solely from production. The entire economic interest therefore devolved upon the taxpayer. In *Bel v. United States,* 160 F.Supp. 360 (W.D.La.1958), the taxpayer was allowed capital gains treatment for the payments in dispute because as vendor of sand and gravel beneath specific land he had taken back the vendee's unconditional promissory notes to which he could look for his return. The obligations evidenced by the notes in no way depended on production. He had severed his investment totally and the court so held. Similarly in *Robert M. Dann,* 30 T.C. 499 (1958), the vendor of fill dirt was permitted capital gains treatment for sales proceeds, because he looked not to production but solely to contractual rights against the buyers of the dirt. *Id.* at 506. *Accord, Wayman A. Collins,* 56 T.C. 1074 (1971). In *Gowans v. Commissioner of Internal Revenue,* 246 F.2d 448 (9th Cir. 1957), the court approved capital gains treatment finding a sale of sand in place, observing that the taxpayer looked not only to production for income, but also "received substantial compensation wholly unrelated to sand withdrawals," 246 F.2d at 452, in the form of a house, and grading, paving, and pipe laying services. Where one derives income other than solely from extraction or production of minerals, generally he has disposed of his economic interest in

minerals in place. If such disposition amounts to a "sale" and other prerequisites are met, capital gains treatment is authorized.

 We believe that these taxpayers looked solely to production or extraction for their return within the rules announced in the above-referenced authorities. First we reiterate that an advance minimum royalty or bonus payment does not lead inevitably to the conclusion that a taxpayer looks other than to production for a return of capital. Such a payment does not defeat the taxpayers' economic interest. *Burnet v. Harmel, supra.* But more importantly for purposes of the present cases, the minimum payment provisions of paragraph 8 in these agreements do not change the result. Taxpayers' error in construing that paragraph lies in supposing that it requires the lessee to pay $1,500 each and every time a single shovel of dirt is turned over on any acre of the taxpayers' land. We may assume without deciding that this interpretation would induce us to agree that payments did not depend solely on production, but rather in part on mere excavation. A closer reading of the words in paragraph 8, however, makes it abundantly clear to us that the $1,500 per acre minimum payment amounts to *royalty; i. e.,* compensation paid in respect of the taxpayers' interest in *minerals* underlying the entire tract. In principle the per acre minimum figure does not differ from the minimum advance and production royalties specified in other paragraphs of the lease. The parties to that instrument have agreed that notwithstanding the minimum calculated on the basis of production or otherwise, the total of royalty payments to be received by taxpayers over the life of the lease will in no event fall below the yardstick figure of $1,500 multiplied by the total number of acres or fractions of acres excavated for the purpose of extracting sand and/or gravel. If this interpretation were incorrect and that of the taxpayer accepted, the words "by way of royalty either prepaid or actual," and the entire final sentence of paragraph 8 would be utterly without meaning, contrary to set-

tled rules of construction. If a minimum advance royalty or bonus does not cause a taxpayer to look to something other than production for a return, *Burnet v. Harmel, supra,* then neither does the minimum in the instant cases which is calculated by reference to acreage.[8]

Aside from our basic economic interest approach in these cases, other factors appear upon examination of the record which point to the absence of the sale which is so critical to the capital gain characterization now sought by taxpayers. Taxpayers and Gifford-Hill denominated their relationship as that of lessor and lessee. At no time do any of the various writings before us speak of a sale of sand or gravel by plaintiffs to their lessee. While the language selected for an agreement does not bind us, we think it may properly be taken into account as tending to validate our basic conclusion that taxpayers intended to and did retain an economic interest in the minerals in place in the land to which they retained title. *See Vest v. C. I. R.,* 481 F.2d 238 (5th Cir.), *cert. denied,* 414 U.S. 1092, 94 S.Ct. 722, 38 L.Ed.2d 549 (1973); *Rhodes v. United States, supra.* Moreover, the parties to such agreements defined the compensation running to plaintiffs as "royalty." One court sitting en banc thought this terminology under the weight of authority in both hard mineral and oil and gas cases to be inherently incompatible with treatment of a mineral payment as the proceeds of a sale. *United States v. White,* 401 F.2d 610, 614 (10th Cir. 1968).

The court finds as a matter of law that the plaintiffs did not dispose of their entire economic interests in the sand and gravel underlying their fee lands, but retained such an interest by virtue of a leasing arrangement with Gifford-Hill wherein their compensation was dependent upon production. Because of this conclusion, defendant's motion for partial summary judgment in No. 314–74 and for summary judgment

in No. 315–74 is allowed and the plaintiffs' cross-motions are denied. The petition in No. 315–74 is dismissed. The petition in No. 314–74 is dismissed in part and that case is remanded to the Trial Division for further proceedings consistent with this opinion.

---

8. Although the matter was not thoroughly discussed, a "minimum royalty of $2000 per acre for each acre used, stripped or damaged" in limestone operations failed to convince one court that the taxpayers looked other than solely to production. *Belknap v. United States,* 406 F.2d 737, 738 (6th Cir. 1969).