JOE C. DAVIS, ESTATE OF RASCOE B. DAVIS, THIRD NATIONAL BANK, EXECUTOR, AND DELTA C. DAVIS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JOE C. DAVIS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6540–77, 6319–78.     Filed July 31, 1980.

*William Waller, James T. O'Hare,* and *Elliott W. Jones,* for the petitioners.

*Robert B. Nadler,* for the respondent.

## OPINION

FAY, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Petitioner(s) | Docket No. | Year | Deficiency |
|---|---|---|---|
| Joe C. Davis | 6540–77 | 1967 | $2,562.55 |
| | | 1968 | 39,926.07 |
| | | 1969 | 43,827.58 |
| | | 1970 | 28,660.40 |
| | | 1971 | 33,501.26 |
| Joe C. Davis | 6319–78 | 1972 | 398,422.68 |
| | | 1973 | 63,673.85 |
| | | 1974 | 65,240.58 |
| | | 1975 | 59,781.49 |
| Estate of Rascoe B. Davis, deceased, Third National Bank, executor, and Delta C. Davis | 6540–77 | 1967 | 114.18 |
| | | 1968 | 1,172.93 |
| | | 1969 | 1,521.49 |
| | | 1970 | 1,791.68 |
| | | 1971 | 2,027.86 |

These cases have been consolidated for purposes of trial, briefing, and opinion.

Because of concessions, the remaining issues presented are:

(1) Whether all or any part of advanced and earned royalties, paid on coal mining leases by petitioners' partnership with respect to coal disposed of by sublease under sections 631(c) and 1231,[1] are (a) deductible from ordinary income under section 162 or (b) must be subtracted from coal royalty receipts with the net amount treated as either capital gain or ordinary loss under section 1231;

(2) Whether the tax benefit rule requires petitioner Joe Davis to treat as ordinary income rather than capital gain certain amounts of royalty income allocated to him by his partnership with respect to contributed coal mining leases on which he and his controlled corporation had previously taken ordinary deductions for advanced minimum royalties;

(3) Whether petitioner Joe Davis realized taxable income upon gifts of stock to trusts for the benefit of nephews and nieces where such gifts were conditioned upon the trustee's agreed payment of the resulting gift taxes.

All of the facts have been stipulated and are found accordingly.

Petitioner Joe Davis resided in Nashville, Tenn., at the times his petitions were filed herein. When their petition was filed in this case, Third National Bank, executor of the Estate of Rascoe Davis, had its principal place of business in Nashville, Tenn., and Delta C. Davis, Rascoe's widow, resided in Nashville, Tenn. Delta C. Davis is a party herein only because she filed joint returns with her husband Rascoe for the years in issue.

During each of the years in controversy, petitioner Joe Davis, his brother Rascoe Davis, now deceased, and five other individuals were partners in a joint venture initially called Davis Webster County Development, and later, Cumberland Land Co. (hereinafter Cumberland). Cumberland was organized under a joint venture agreement dated January 1, 1966. Joe Davis had a

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

66⅔-percent interest in Cumberland's profits and losses; Rascoe Davis' interest was 4⅜ percent.[2] Cumberland and each of its partners were calendar year, cash basis taxpayers.

Cumberland was in the business of leasing coal mining rights from landowners in Kentucky and then subleasing those rights to a mining company called Webster County Coal Corp. (hereinafter Webster Coal). Between 1967 and 1971, the same individuals who were partners in Cumberland owned all of the stock of Webster Coal, with the exception that Joe Davis held some Webster Coal stock through his controlled corporation, Davis Coals, Inc. (hereinafter Davis Coals). On February 22, 1971, an unrelated corporation called Mapco, Inc., acquired Webster Coal by merger.

All of Cumberland's transactions were carried out in the following manner. Cumberland acquired by lease the rights to mine seams of No. 9 grade coal on or underlying the properties of various landowners. In every case but one, the consideration for the lease was the greater of an advanced yearly minimum amount, paid on acquisition, or earned royalties[3] of 10 cents a ton for coal mined under the lease. The yearly minimum royalties were "advanced" in the sense that when coal was later mined, the earned royalties then due were reduced by credits for earlier unearned royalties paid.

Cumberland's leases were thereafter subleased to the mining operator, Webster Coal. Between 1966 and 1971, 11 subleases were executed in all, which for convenience will be referred to in the order in which they were executed. In some cases, leases were subleased to Webster Coal immediately after Cumberland acquired them.[4] More frequently, however, a group of leases acquired over time was later subleased to Webster Coal as a unit. For example, the seventh sublease, dated March 30, 1970,

---

[2]This interest was held by the Estate of Rascoe Davis for years after 1971, which are not here in issue.

[3]The term "earned royalties" is commonly used in commercial practice and the law to distinguish them from advanced royalties. See *Briscoe v. United States*, 210 Ct. Cl. 158, 536 F.2d 353 (1976) (sand and gravel); *Gann v. Commissioner*, 31 T.C. 211 (1958) (book royalties); *Louis Werner Saw Mill Co. v. Commissioner*, 26 B.T.A. 141 (1932) (oil and gas); *Omer v. United States*, an unreported case (W.D. Ky. 1962, 11 AFTR 2d 383, 63–1 USTC par. 9113) (coal).

[4]The second, fifth, and ninth subleases—dated Mar. 26, 1967, Sept. 22, 1969, and Oct. 23, 1970, respectively—each transferred to Webster Coal a lease that Cumberland had executed with the landowner(s) on the same day as the date of sublease.

transferred to Webster Coal Cumberland's rights under five separate leases acquired between April 1968 and April 1969. On the other hand, in the 10th sublease, dated November 1, 1970, Cumberland transferred to Webster Coal its rights under 19 leases acquired between August and October of that same year. Whatever the delay between lease and sublease, Cumberland subleased all of the coal mining rights it acquired and never mined coal itself.

Under each sublease, Cumberland was entitled to either earned royalties on the coal extracted or yearly advanced minimum royalties. Earned royalties were the greater of 30 cents per ton or 8½ percent of the gross sales price. However, Webster Coal paid advanced minimum royalties at the end of each lease year if earned royalties were less than the specified minimum. Thus, although Cumberland's advanced minimum payments to landowners in a given year could exceed royalty income, for coal actually mined Cumberland was ensured a profit of at least 20 cents per ton. Profits on a particular sublease would be larger either if royalties due the landowner were reduced by credits for earlier advanced royalties or if Cumberland's royalty income was greater than 30 cents per ton, based on 8½ percent of Webster Coal's gross sales price.

Prior to Cumberland's formation, petitioner Joe Davis owned three coal leases, designated the Palmer Bros., Early, and Trader leases, on which he paid advanced minimum royalties. Like those later acquired by Cumberland, each of the leases gave Joe Davis the right to mine a seam of No. 9 coal and required him to pay earned royalties of 10 cents per ton, but specified advanced minimum amounts in each year whether coal was mined or not. From 1960 through 1963, Joe Davis paid $22,444.84 in advanced minimum royalties on the three leases. In 1964 Davis Coals, then named Davis & Hamilton Coals, Inc., agreed to make the minimum royalty payments on the leases in return for exclusive rights to sell the coal. Under this agreement, Davis Coals paid $47,917.26 on the three leases between 1964 and 1967.[5] Both Joe Davis and Davis Coals claimed ordinary deductions for the payments on their tax returns for the years involved.

---

[5] The record does not explain why Davis Coals made two payments in 1967 totaling $9,000 *after* the leases had been assigned by Joe Davis to Cumberland in October 1966, as discussed below.

On October 1, 1966, Joe Davis assigned the three leases to Cumberland as a contribution to capital, along with "all rights to advance or prepaid rents and/or royalties and credit therefor under each and all of the leases herein assigned." The transfers were subject to the following terms of the joint venture agreement:

> The leases are unencumbered except for current taxes and a lease royalty payment in the aggregate of a minimum per year as set forth in each lease or $0.10 per ton to the landowner, which ever [sic] amount is greater. The assignment will be made subject to the foregoing and the right to recover all royalty prepaid by Davis on said leases for which the Syndicate [Cumberland] shall receive credit from the landowner.

On October 31, 1966, the Palmer Bros., Early, and Trader leases were subleased to Webster Coal. As under all later subleases, Webster Coal agreed to pay Cumberland earned royalties of 30 cents per ton or 8½ percent of the gross sales price, or, if greater, specified yearly advanced minimum royalties.

In the years 1967, 1968, 1969, and 1972, Cumberland specially allocated certain amounts of royalty income to Joe Davis pursuant to that part of the joint venture agreement entitling him to recover advanced royalties on the Palmer Bros., Early, and Trader leases for which Cumberland received credits from the landowners. In other words, as coal was mined, Cumberland allocated royalty income to Joe Davis to the extent its payments of earned royalties to landowner-lessors were reduced by credits for prior advanced minimum royalties. Income was specially allocated to Joe Davis and disbursed to him as follows:

| Year | Allocation | Date(s) paid | Amount |
|------|-----------|-------------|--------|
| 1967 | $5,394.33 | Apr. 26, 1968 | |
| 1968 | 16,062.27 | Mar. 25, 1968 | |
| 1969 | 30,000.00 | Jan. 15, 1969 | $682.20 |
| | | Feb. 21, 1969 | 4,639.18 |
| | | Mar. 24, 1969 | 4,479.97 |
| | | Apr. 24, 1969 | 5,963.27 |
| | | May 23, 1969 | 6,905.33 |
| | | June 25, 1969 | 2,500.02 |
| | | July 21, 1969 | 4,830.03 |

| 1972 | $19,205.50 | Feb. 23, 1972 | $300.00 |
|------|------------|---------------|---------|
|      |            | Apr. 12, 1972 | 18,905.50 |
| Total | [6] 70,662.10 | | |

The above payments were treated in Cumberland's books as "Joe Davis, Special Capital," and the allocations were reported on Cumberland's partnership returns for those years as specially allocated long-term capital gain. The balance of the royalty income Cumberland received in those years was shared between all the partners in proportion to their partnership interests. In the other years before us, all royalties received were allocated among the partners according to their interests.

On its partnership returns filed for the years in controversy, Cumberland reported substantially all of the royalties it received from Webster Coal as long-term capital gain.[7] Such income was also reported by Cumberland's partners as long-term capital gain.[8]

Between 1967 and 1971, Cumberland paid both advanced minimum royalties and earned royalties on the coal mining leases it subleased to Webster Coal. Most of the advanced minimum royalties were paid to landowners on leases on which no mining took place in the year of payment. Of these advanced royalties, a significant portion was paid on leases which had not yet been subleased to Webster Coal. After February 1971 when Webster Coal was acquired by Mapco, Inc., Cumberland did not make further advanced minimum payments but continued to pay substantial earned royalties. Table I on page 888 sets forth the types and amounts, by year, of all royalties paid to landowners by Cumberland in the years in issue, together with royalties received from Webster Coal which were reported by Cumberland as long-term capital gain.

All of Cumberland's landowner royalties and other expenses, such as office and professional fees, were allocated among the

---

[6]For reasons unexplained by the record, this amount is $300.02 larger than the sum of the advanced minimum royalties paid by Joe Davis and Davis Coals.

[7]Relatively small amounts of royalties in 1969 and 1970 were treated as short-term capital gain and these are not in issue. But see Rev. Rul. 59–416, 1959–2 C.B. 159, 161 (these royalties should have been treated as ordinary income subject to depletion).

[8]Petitioners, however, have here conceded that a portion of the royalties Cumberland received in each year from 1967 through 1971 constituted dividends paid by Webster Coal to its shareholders, passed through the partnership.

TABLE I

| Year | (1) Advanced minimum royalties paid on leases prior to sublease[1] | (2) Advance royalties paid on leases with no mining or income production during year | (3) Total advanced minimum royalties paid | (4) Total earned royalties paid | (5) Total royalties (col. 3 plus col. 4) paid during year | (6) Royalty income reported as LTCG |
|---|---|---|---|---|---|---|
| 1967 | $820.00 | $820.00 | $4,792.42 | $10,723.51 | $15,515.98 | $16,184.62 |
| 1968 | 6,856.87 | 11,649.29 | 16,649.29 | 106,730.77 | 123,380.06 | 268,989.88 |
| 1969 | 19,827.13 | 24,050.35 | 29,183.60 | 86,049.41 | 115,283.01 | 480,662.50 |
| 1970 | 15,506.32 | 31,771.28 | 39,217.61 | 101,481.05 | 140,698.66 | 536,973.10 |
| 1971 | | 8,165.89 | 8,714.20 | 99,819.06 | 108,533.26 | 381,881.12 |
| 1972 | | | | ²99,673.31 | 99,673.31 | 398,711.04 |
| 1973 | | | | 109,026.28 | 109,026.28 | 430,238.31 |
| 1974 | | | | 222,010.50 | 222,010.50 | 1,309,808.58 |
| 1975 | | | | 254,934.88 | 254,934.88 | 2,025,084.10 |

[1] These figures were derived from the record by matching the figures and dates for advanced minimum royalty payments totaled in col. 3 against the date of the relevant sublease, and then totaling only these payments made prior to the date the lease was subleased to Webster Coal.

[2] Cumberland's 1972 partnership returns show it paid $39,995.76 in advance royalties and $59,677.55 in earned royalties. However, we will accept the parties' stipulated characterization of all 1972 royalties paid as earned royalties.

partners in proportion to their interests. Cumberland and each of its partners treated all expenses as deductions from ordinary income on their Federal income tax returns for the years in question.[9] Thus, Cumberland and its partners were consistently reporting all royalty income as capital gain while deducting all royalties paid and other expenses from ordinary income. Cumberland reported no amounts as gain or loss from the sale or exchange of property under section 1231. What each partner actually received was his distributive share of royalty income minus his share of expenses, without regard to tax character.

In December 1972, petitioner Joe Davis made gifts of unencumbered securities to trusts he had established for the benefit of six nephews and nieces. At the time of the gifts, the securities were substantially appreciated, having a value of $3,546,875 and a basis in the hands of Joe Davis of $21,670.

The transfers in trust were expressly conditioned on the common trustee's payment of all Federal and State gift taxes and other taxes imposed on the donor by virtue of the transfers. Pursuant to those terms in the trust agreements, in 1973 the trustee paid $1,174,381.14 in State and Federal taxes. As authorized by the trust instruments, the trustee borrowed funds on behalf of the trusts for this purpose.

In his statutory notices of deficiency, respondent determined that Cumberland and its partners were not entitled to ordinary deductions for advanced and earned royalties paid on coal leases subleased to Webster Coal. Instead, respondent determined that Cumberland was required to subtract royalties paid from royalties received and to report its net income as long-term capital gain or loss. Respondent now concedes, however, that for 1967 Cumberland and its partners are entitled to report ordinary loss from coal leasing operations under section 1231.[10]

---

[9]In his notices of deficiency for the years 1967 through 1971, respondent disallowed as deductions from ordinary income Cumberland's office and professional expenses, and applied them to reduce royalty income treated as capital gains under secs. 631(c) and 1231. See sec. 272; secs. 1.272–1(d) and 1.631–3(a), Income Tax Regs. Petitioners do not challenge this determination.

On the other hand, in the deficiency notice for the years 1972 through 1975, respondent expressly allowed such expenses to Cumberland and petitioner Joe Davis as ordinary deductions. We will not disturb the parties' inconsistent treatment of these expenses because the issue has not been raised by the parties.

[10]This result depends in part upon respondent's separate treatment of royalty income

In his statutory notice for 1967 through 1971 to Joe Davis, respondent determined that special allocations of coal royalty income to Joe Davis in 1967, 1968, and 1969 constituted ordinary income and not capital gain. By amendment to his answer to the petition, respondent alleged that the 1967 allocation of $5,394.33 should instead have been reported as ordinary income in 1968, the year such income was actually paid over to Joe Davis. Respondent further asserted by amended answer that specially allocated coal royalties in the amount of $19,205.50 for 1972 should likewise have been reported by Joe Davis as ordinary income and not capital gain.

In his statutory notice to Joe Davis covering the year 1972, respondent determined that Joe Davis realized income in that year[11] of $1,152,761.33 upon his gifts of appreciated securities to certain trusts on condition that the trustee pay all resulting taxes.

## Issues 1 and 2

The first and second issues involve advanced minimum royalties and earned royalties paid to landowners on leases of coal mining rights subleased under section 631(c).

A landowner who receives royalties under a lease granting rights to extract minerals in place is not ordinarily entitled to report such income as capital gain. See *Burnet v. Harmel*, 287 U.S. 103 (1932). Speaking generally, a transaction will be treated as a lease and not as a "sale or exchange," a prerequisite to capital gain under section 1222, whenever the owner-lessor retains a continuing nonoperating economic interest in the minerals being mined. See *Palmer v. Bender*, 287 U.S. 551 (1933); *Belknap v. United States*, 406 F.2d 737 (6th Cir. 1969); *United States v. Witte*, 306 F.2d 81 (5th Cir. 1962); *Lesher v. Commissioner*, 73 T.C. 340 (1979).

However, to provide special relief for the recipients of coal royalties, Congress, in 1951, enacted what is today section 631(c). S. Rept. 781, 82d Cong., 1st Sess. (1951), 1951–2 C.B. 458, 488.

---

specially allocated to Joe Davis. In view of our determination of the second issue herein in favor of that petitioner, respondent's concession will not apply to Joe Davis' royalty income for 1967 because he realized a net profit from coal royalties for that year.

[11]On brief, respondent alternatively suggests this income was realized in 1973, the year in which the gift taxes were paid by the trustee.

Stated simply, section 631(c) transforms the owner-lessor's otherwise ordinary income into capital gain. The statute is complex.

Section 631(c) provides in part:

(c) DISPOSAL OF COAL OR DOMESTIC IRON ORE WITH A RETAINED ECONOMIC INTEREST.—In the case of the disposal of coal (including lignite), or iron ore mined in the United States, held for more than 6 months before such disposal, by the owner thereof under any form of contract by virtue of which such owner retains an economic interest in such coal or iron ore, the difference between the amount realized from the disposal of such coal or iron ore and the adjusted depletion basis thereof plus the deductions disallowed for the taxable year under section 272 shall be considered as though it were a gain or loss, as the case may be, on the sale of such coal or iron ore. Such owner shall not be entitled to the allowance for percentage depletion provided in section 613 with respect to such coal or iron ore. This subsection shall not apply to income realized by any owner as a co-adventurer, partner, or principal in the mining of such coal or iron ore, and the word "owner" means any person who owns an economic interest in coal or iron ore in place, including a sublessor. The date of disposal of such coal or iron ore shall be deemed to be the date such coal or iron ore is mined. In determining the gross income, the adjusted gross income, or the taxable income of the lessee the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of this subsection. * * *

By its terms, section 631(c) applies to the disposal of coal (or iron ore, not applicable here) "by the owner thereof under any form of contract by virtue of which such owner retains an economic interest in such coal." This language describes a lease of mining rights in return for royalties based on production. S. Rept. 781, *supra*, 1951–2 C.B. at 488. Under such an arrangement, a lessor of coal rights has "retained an economic interest" in the coal because his royalty income depends on the amount of coal mined. See *Palmer v. Bender, supra;* sec. 1.611–1(b)(1), Income Tax Regs. See generally J. Coggin III, "Disposition of Coal Interests: Section 631(c)," 29 Tax Law. 95 (1975). See also *Paragon Coal Co. v. Commissioner,* 380 U.S. 624 (1965); *Omer v. United States,* 329 F.2d 393 (6th Cir. 1964).

The key statutory language appears toward the end of the first sentence: "the [net] amount realized * * * shall be considered as though it were a gain or loss, as the case may be, on the sale of such coal or iron ore." In short, section 631(c)

treats royalty income or loss under a coal lease as having been realized in a sale or exchange. In addition, section 1231(b)(2)[12] treats section 631(c) coal as "property used in the trade or business." See sec. 1.1231–1(c)(3), Income Tax Regs. Taken together, the two sections treat the net royalty income of a coal lessor as capital gain.

Section 272 completes this statutory scheme. Section 272 provides:

> Where the disposal of coal or iron ore is covered by section 631, no deduction shall be allowed for expenditures attributable to the making and administering of the contract under which such disposition occurs and to the preservation of the economic interest retained under such contract, except that if in any taxable year such expenditures plus the adjusted depletion basis of the coal or iron ore disposed of in such taxable year exceed the amount realized under such contract, such excess, to the extent not availed of as a reduction of gain under section 1231, shall be a loss deductible under section 165(a). This section shall not apply to any taxable year during which there is no income under the contract.

Applying only to taxpayers disposing of coal (or iron ore) under section 631(c), section 272 accomplishes two tasks. First, overhead and administrative costs associated with a coal royalty contract are factored into the section 1231 equation and their deduction otherwise is disallowed. See secs. 1.272–1(a) and 1.631–3(a)(1), Income Tax Regs. In effect, section 272 treats administrative expenses as part of the cost of the coal disposed of under the lease.[13] Second, if a coal lessor realizes a net loss for the year under section 1231, excess administrative costs and depletion basis are expressly made deductible from ordinary income. Sec. 1.272–1(c), Income Tax Regs.

In summary, coal royalty income or loss in a given year is treated as having been realized from a sale or exchange of property used in the trade or business. The result is that coal lessors are entitled to report under section 1231 either ordinary loss or capital gain, as the case may be.

A coal lessor under section 631(c) is not allowed a depletion

---

[12]Sec. 1231(b)(2) provides:

(2) TIMBER, COAL, OR DOMESTIC IRON ORE.—Such term ["property used in the trade or business"] includes timber, coal, and iron ore with respect to which section 631 applies.

[13]Examples of such administrative expenses include ad valorem taxes, insurance, and professional fees associated with a coal lease. Sec. 1.272–1(d), Income Tax Regs.

deduction. Instead, lessors must reduce their gross royalty income by the adjusted depletion basis of the coal disposed of (plus administrative costs disallowed under section 272).[14] Sec. 1.631–3(a)(1) and (b)(1), Income Tax Regs. In this respect, coal lessors are treated in the same way as other mineral owners entitled to capital gain on a sale or exchange, who must report as gain their amount realized minus adjusted basis under section 1001(a). Under section 631(c), the "adjusted depletion basis" of the coal is the same amount as would have been the allowance for cost depletion under section 612. Sec. 1.631–3(b)(2), Income Tax Regs. The allowance for cost depletion under section 612 is the cost or other adjusted basis of the mineral produced as those terms are defined in sections 1011, 1012, and 1016, generally expressed as a cost per unit extracted. Secs. 1.611–2(a), 1.612–1, Income Tax Regs. Thus, section 631(c) operates only upon the coal lessor's gross royalty receipts minus the costs of the coal mined, that is, his net royalty income or loss.

The lessee's position is different. First of all, the lessee engaged in mining and selling coal is not entitled to capital gain under section 631(c). This is partly because section 1221(1) treats sales in the ordinary course of business as ordinary income, partly because a lessee-operator simply does not qualify as a lessor, and partly because section 631(c) expressly excludes mining principals.[15] With regard to the lessee's costs, section 631(c) provides: "In determining the gross income, the adjusted gross income, or the taxable income of the lessee, the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of this subsection." Thus, the lessee reporting ordinary income from the sale of coal is entitled to ordinary deductions for his operating costs, including royalties paid. Sec. 1.631–3(b)(3)(i), Income Tax Regs. Furthermore, as the owner of an operating interest, the lessee may, at his option, deduct advanced minimum royalties either in the year

---

[14]Sec. 631(c) provides in part:

the *difference between the amount realized* * * * *and the adjusted depletion basis thereof* * * * shall be considered as though it were a gain or loss, as the case may be, on the sale of such coal * * * *. Such owner shall not be entitled to the allowance for percentage depletion provided in section 613 with respect to such coal or iron ore. [Emphasis added.]

[15]Sec. 631(c) provides in part: "This subsection shall not apply to income realized by any owner as a co-adventurer, partner, or principal in the mining of such coal."

paid or accrued or for the year in which the mineral product involved is sold. Sec. 1.612–3(b)(3), Income Tax Regs. (1965) (amended 1977).

A sublessor is both a lessor and a lessee. Section 631(c) provides, "the word 'owner' means any person who owns an economic interest in coal * * * in place, including a sublessor." Thus, a sublessor both is considered an "owner" and is treated as having an "economic interest" in the coal it has subleased the rights to mine. The result in this case is that Cumberland and each of its partners may report their royalty income from subleasing under section 631(c).

With respect to royalties paid, the regulations treat a sublessor like a lessor rather than a lessee. Section 1.631–3(b)(3)(ii)(a), Income Tax Regs., states: "Rents and royalties paid with respect to coal or iron ore disposed of by * * * [a lessee who is also a sublessor] under section 631(c) shall increase the adjusted depletion basis of the coal or iron ore and are not otherwise deductible." An accompanying example provides that the effect of this regulation is that a sublessor must treat gross royalty income under the sublease minus royalties paid to lessors (and administrative expenses) on the underlying lease as net royalty income taxable under section 631(c).[16]

The first issue in these consolidated cases is whether petitioners may deduct from ordinary income all or any portion of advanced and earned coal royalties paid by their partnership with respect to coal disposed of by sublease under section 631(c).

Between 1967 and 1971, Cumberland paid three categories of royalties to landowner-lessors: (1) Advanced minimum royalties paid on leases prior to their sublease to Webster Coal, (2) advanced minimum royalties paid after subleasing but prior to any mining operations, (3) earned royalties paid to landowners for coal mined by Webster Coal. From 1972 on, Cumberland paid only earned royalties. In all years, the amount of earned royalties due on a particular lease may have been reduced by credits from the landowner for earlier paid advanced minimum royalties.

---

[16]Sec. 1.631–3(b)(3)(ii)(b), Income Tax Regs., states:

"*Example*. B is a sublessor of a coal lease; A is the lessor; and C is the sublessee. B pays A a royalty of 50 cents per ton. C pays B a royalty of 60 cents per ton. The amount realized by B under section 631(c) is 60 cents per ton and will be reduced by the adjusted depletion basis of 50 cents per ton, leaving a gain of 10 cents per ton taxable under section 631(c)."

Petitioners argue they may deduct their shares of Cumberland's royalty payments to landowners from ordinary income under section 162. They contend section 631(c) permits lessees ordinary deductions and does not separately treat lessees who are also sublessors. Petitioners realize section 1.631–3(b)(3)(ii) of the regulations is to the contrary, but argue that the regulation is unauthorized and invalid. Petitioners further contend that even if earned royalties are not deductible, advanced minimum royalties paid are deductible where there has been no mining under sublease. Finally, petitioners argue that advance royalties paid on a lease prior to its assignment by sublease are deductible from ordinary income in any case.

Respondent argues that a sublessor must treat all royalties paid as reducing net section 631(c) gain. This is a case of first impression, and respondent relies entirely upon the statute, the regulations, and the settled principle that regulations will ordinarily be sustained unless unreasonable and plainly inconsistent with the statute. E.g., *Fulman v. United States*, 434 U.S. 528 (1978). However, for purposes of this case respondent has conceded that advanced minimum royalties may be taken into account when paid and has stipulated that advanced royalties paid in a given year may produce ordinary loss under sections 272 and 1231 if such payments exceed section 1231 gains.[17] Because of respondent's concession we are not asked, in this case, to apply literally or to rule on the validity of section 1.631–3(b)(3)(ii)(a) of the regulations which states that royalties paid by a sublessor are to be added to the adjusted depletion basis of the coal disposed of under sublease. Applied literally, this regulation would deny any deduction for advanced minimum

---

[17]On brief, respondent argued:

"With respect to the advanced royalty payments, it is the respondent's legal position that such payments must be included in the adjusted depletion basis along with earned royalty payments and made a part of the sec. 631(c) computation not in the year of payment, but in the year of disposal of the coal."

This "legal position" directly contradicts respondent's stipulation that "Under the theories respondent advances, the respondent concedes that the [net] loss [in 1967] is an ordinary loss." Moreover, in his notice of deficiency, respondent took all royalties paid to landowners into account when paid. It is obvious from the chart at p. 888 *supra*, that requiring Cumberland to capitalize advanced minimum royalties would lead to increased deficiencies for the early years of Cumberland's operations. We conclude that respondent conceded this issue by not asking for increased deficiencies based thereon. We see no point in giving advisory opinions on legal theories respondent argues in vacuo. *Fernandez v. Commissioner*, 15 B.T.A. 1369 (1929).

royalties paid by a sublessor until the coal was later mined. But because respondent has here conceded *when* Cumberland's partners may take royalties paid into account, we are only asked to decide whether such payments must be applied against section 631(c) royalty income or whether they may be deducted from ordinary income. In effect, respondent has applied the example at section 1.631–3(b)(3)(ii)(*b*) of the regulations without regard to the different kinds of royalties paid by Cumberland.

For the reasons below, we agree with respondent.

To begin with, it is clear that earned royalties paid by a sublessor of coal mining rights are not deductible from ordinary income. The statute treats sublessors as "owners." Section 631(c) allows an owner-lessor to treat as capital gain *"the difference between* the amount realized from the disposal of such coal * * * and the adjusted depletion basis thereof" (and administrative costs disallowed under section 272). (Emphasis added.) We think that a sublessor, if entitled to the benefits of section 631(c), must calculate the amount of his income or loss accordingly. Therefore, a sublessor under section 631(c) must reduce his gross royalty income by the adjusted depletion basis of the coal mined under the sublease plus other expenses disallowed by section 272. For such a sublessor, the adjusted depletion basis or cost per unit of coal extracted must be interpreted to include earned royalties paid. The royalties paid by a sublessor are his cost for the coal subleased.

Thus, our reading of the statute gives us the general rule stated in the regulations: royalties paid by a sublessor reduce royalty income for purposes of sections 631(c) and 1231 and are not otherwise deductible. Sec. 1.631–3(a) and (b)(3)(ii), Income Tax Regs. This result is consistent with the overall statutory scheme of sections 272, 631(c), and 1231(b)(2), wherein Congress intended that all of the costs of a lessor or sublessor should be subtracted from gross royalty receipts. See H. Rept. 1337, 83d Cong., 2d Sess. 59 (1954); Staff of the Joint Comm. on Internal Revenue Taxation, Summary of the New Provisions of the Internal Revenue Code of 1954, at 80–81 (Comm. Print 1955).

The language in the statute which provides that the lessee's deductions are not affected by section 631(c) cannot be read as applying to sublessors. Congress never considered this possibility in 1954 when sublessors were added to the statute. See H. Rept. 1337, *supra* at 59, A190 (1954); S. Rept. 1622, 83d Cong., 2d Sess.

81, 338 (1954). However, it is reasonably clear that the sentence excluding "the lessee" was added when the statute was enacted only to ensure that those not benefiting from section 631(c) would not be adversely affected either.[18]

Permitting coal sublessors to report royalty receipts as capital gain and royalties paid as ordinary deductions would lead to results that could not have been intended by Congress. To take a hypothetical example, assume that in 1975 a sublessor disposes of 100,000 tons of coal for $1.50 per ton and receives royalties of $150,000. If this sublessor owed the landowner-lessor $1 per ton on the underlying lease, he would pay royalties of $100,000. Treating the expense as an ordinary deduction and all of the income as long-term capital gain, this sublessor would reduce his capital gains by $75,000 under section 1202 ($90,000 under present law) in addition to a $100,000 deduction for royalties paid. Although he has a net economic gain of $50,000 from coal royalties, this sublessor has achieved excess deductions of $25,000 ($150,000 - $175,000) capable of sheltering other ordinary income from tax. In effect, petitioner's interpretation of the statute would permit double deductions from a sublessor's coal royalty income. But see *United States v. Skelly Oil Co.*, 394 U.S. 678 (1969).

The more reasonable interpretation of the statute is to require the coal sublessor, like the lessor, to report his net royalty income under section 631(c). Applied to the above hypothetical, the sublessor would report his economic gain of $50,000 as capital gain under section 1231.

Most of the foregoing analysis applies equally to the advanced minimum royalties paid on nonoperating leases that had been subleased to Webster Coal. We include in this category those leases subleased on the same day that the lease was acquired. *Gregory v. Helvering*, 293 U.S. 465 (1935). Advanced royalties paid on leases that had been subleased remain payments by a sublessor. As such, they should not be deductible from ordinary income for the reasons we have already set forth. It bears noting

---

[18]S. Rept. 781, 82d Cong., 1st Sess. (1951), 1951–2 C.B. 458, 488, 575:

"It is also made clear that these provisions do not apply to a lessee * * *

"For the purpose of clarification, your committee has also expressly provided that, in determining the gross income, the adjusted gross income, or the net income of the lessee, the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of section 117(k)(2), as amended by this section."

that any advanced minimum royalties Cumberland received from Webster Coal under a sublease were entitled to capital gain treatment, provided the other requirements of the statute were satisfied. Sec. 1.631–3(c)(1), Income Tax Regs. Since Cumberland was entitled to treat sublease income received prior to mining under section 631(c), we think advance royalties paid to landowners prior to mining must also be taken into account under section 631(c). As discussed above, respondent has here conceded that advanced minimum royalties may be taken into account in the taxable years paid.

We realize section 272 permits the deduction of administrative costs in years in which no royalty income is realized. The last sentence of section 272 provides, "This section shall not apply to any taxable year during which there is no income under the contract." However, we do not think advanced minimum royalties fall within the ambit of section 272. Advance royalties are not "expenditures attributable to the making and administering of the contract" (sec. 272), they are part of the cost of the coal itself. The cost of the coal mined and administrative costs are each treated in the same way under section 631(c), but that is not to say they are the same thing. We hold that section 272 authorizes no deduction for advanced minimum royalties paid on inactive leases.

A more difficult issue is presented by the advanced minimum royalties paid by Cumberland on leases prior to their sublease to Webster Coal. In accordance with a general principle of natural resource taxation, the regulations under section 631(c) treat individual lease contracts independently. See sec. 1.631–3(b) and (c), Income Tax Regs. See generally sec. 614(a); secs. 1.272–1(a) and (b)(2), 1.611–1(d)(1)(i), 1.614–1(a), Income Tax Regs. With respect to those leases that had not yet been subleased to Webster Coal, Cumberland was technically only a lessee. As discussed earlier, section 631(c) does not apply to a lessee who is not a sublessor.

Under section 1.612–3(b)(3), Income Tax Regs. (1965) (amended 1977), a lessee who owns an operating interest in minerals in place may elect to deduct advanced minimum royalties in the year in which they are paid or accrued. This regulation was promulgated after the Commissioner lost a number of early cases which held that yearly minimum royalties were in part a period cost like rent. E.g., *Commissioner v. Jamison Coal & Coke*

*Co.*, 67 F.2d 342 (3d Cir. 1933), affg. in part and revg. in part 24 B.T.A. 554, 568–571 (1931); *Burnet v. Hutchinson Coal Co.*, 64 F.2d 275 (4th Cir. 1933), cert. denied 290 U.S. 652 (1933). However, the regulation specifically excludes a lessee who is a sublessor of coal mining rights under section 631(c). Sec. 1.612–3(b)(3) and (e), Income Tax Regs.

In this particular case, the advanced minimum royalties paid on leases Cumberland had not yet subleased should nevertheless be treated as having been made by a sublessor. The record shows that from the outset Cumberland operated as a sublessor. Cumberland, in every case, subleased to Webster Coal the coal leases it acquired. Cumberland never intended to nor did it ever engage in any mining operations. We therefore find as a fact that, in every case, Cumberland acquired leases and paid advance royalties as a sublessor. Accordingly, these payments, like all other royalties paid by Cumberland, must be taken into account under section 631(c). We reach the same result on the ground that, regardless of the actual time interval, in each instance, lease and subsequent sublease may be viewed as one transaction. See *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Minnesota Tea Co. v. Helvering*, 302 U.S. 609 (1938); *Tube Bar, Inc. v. Commissioner*, 15 T.C. 922 (1950). Moreover, in the circumstances here presented we cannot say that Cumberland was at any time the holder of an "operating interest," as that term is used in section 1.612–3(b), Income Tax Regs. All of Cumberland's leases were held only for sublease to Webster Coal.

We therefore hold that none of the advanced or earned royalties paid by Cumberland may be deducted from petitioners' ordinary income. All royalties paid must be taken into account in computing net royalty income or loss under section 631(c).

The second issue in this case is whether petitioner Joe Davis (hereinafter petitioner, since the second and third issues relate solely to him) is required by the tax benefit rule to treat as ordinary income, rather than capital gain, certain amounts of coal royalty income Cumberland allocated to him in the years 1967, 1968, 1969, and 1972.

Petitioner and his controlled corporation, Davis Coals, paid advanced minimum royalties on certain leases later assigned to Cumberland. Both Joe Davis and Davis Coals deducted these amounts from ordinary income in the years paid. Under

Cumberland's joint venture agreement, petitioner was entitled to reimbursement for prepaid royalties on the assigned leases for which Cumberland received credit from the landowner. Since Cumberland could receive credit for advanced royalties only when earned royalties were due, petitioner was reimbursed only as coal was actually mined. Income was allocated to petitioner under the joint venture agreement in 1967, 1968, 1969, and 1972 and, except for the 1967 allocation which he received in 1968, was paid over to him in the years allocated. Petitioner reported all such income in the years allocated as long-term capital gain realized from coal royalties.

Respondent argues these payments constitute ordinary income under the tax benefit rule. Respondent also argues that this income should be taxed to petitioner in the years paid, not in the years allocated. Petitioner argues the payments were section 631(c) capital gains specially allocated to him under the partnership agreement. We believe petitioner has framed the issue correctly.

At the outset, it is interesting to note respondent does not challenge the deductions taken for advanced royalties by petitioner and his controlled corporation. Evidently it is respondent's "legal position" that these deductions were authorized under section 1.612–3(b)(3), Income Tax Regs.[19] See *Commissioner v. Jamison Coal & Coke Co., supra; Burnet v. Hutchinson Coal Co., supra.* Had the deductions been improper, of course, the tax benefit rule would not apply. *Kingsbury v. Commissioner,* 65 T.C. 1068 (1976); *Canelo v. Commissioner,* 53 T.C. 217 (1969), affd. 447 F.2d 484 (9th Cir. 1971); *Streckfus Steamers, Inc. v. Commissioner,* 19 T.C. 1 (1952). Petitioner has not "shifted his position" herein. Cf. *Unvert v. Commissioner,* 72 T.C. 807 (1979).

Respondent's theory applying the tax benefit rule in this case is not without a good deal of superficial appeal. Under the tax benefit rule, an amount properly deducted from gross income in determining one year's tax liability is includable in gross income when it is recovered in a subsequent year. *Alice Phelan Sullivan Corp. v. United States,* 180 Ct. Cl. 659, 381 F.2d 399 (1967); *Estate of Munter v. Commissioner,* 63 T.C. 663 (1975). Section 111 codifies the corollary principle that where a deductible loss did

---

[19] Compare n. 17 *supra.*

not reduce taxable income, a subsequent recovery is not includable. *Dobson v. Commissioner*, 320 U.S. 489 (1943), rehearing denied 321 U.S. 231 (1944). Where the earlier deduction reduced ordinary income, the character of the recovery included in income is also ordinary. *Merchants National Bank of Mobile v. Commissioner*, 199 F.2d 657 (5th Cir. 1952), affg. 14 T.C. 1375 (1950); *First National Bank of Lawrence County v. Commissioner*, 16 T.C. 147 (1951). See *Weyher v. Commissioner*, 66 T.C. 825 (1976). Respondent here argues that because the royalty income specially allocated to petitioner under the joint venture agreement constituted reimbursement by Cumberland for expenses previously deducted from gross income, petitioner is not entitled to report such income as capital gain.

However, the tax benefit rule does not apply in this case because there has been no "recovery," either by Cumberland or by petitioner.[20] See generally *Nash v. United States*, 398 U.S. 1 (1970). Cumberland did pay less for the coal it mined in the years it received credit for advanced royalties paid by petitioner. Such is the case whenever a prepaid item, be it interest or animal fodder, is later used up. Every properly allowed deduction for an advance payment shifts that expense to a year earlier than the year in which the expense is actually incurred. See generally *Van Raden v. Commissioner*, 71 T.C. 1083 (1979), appeal filed (9th Cir., Sept. 18, 1979). But there is no deemed "recovery" of the earlier expense in the later year any more than there is a matching deemed payment in that year as the prepayment is consumed.

Nor was there any recovery by petitioner. The amounts Cumberland allocated to petitioner were a portion of the earned royalties paid by Webster Coal on coal mined, which were due Cumberland without regard to the timing of royalties paid to landowners. The amounts petitioner received were consistently treated on Cumberland's books, Cumberland's partnership returns, and petitioner's tax returns as specially allocated capital gains from coal royalties. Although the amount of petitioner's allocation was measured by language in the joint venture agreement under which petitioner reserved "the right to recover

---

[20]Because we dispose of this issue on the ground there has been no "recovery" herein, we need not discuss the fact that petitioner did not deduct or receive any tax benefit from payments made and deducted by Davis Coals.

all royalty prepaid by Davis on said leases for which [Cumberland] shall receive credit from the landowner," Cumberland was under no obligation to petitioner unless and until coal was mined. We find that Cumberland's partners intended these payments to petitioner to be an allocation of profits from earned royalties received, rather than a charge paid by Cumberland for coal mined.[21] In short, we find that Cumberland did not purchase petitioner's rights to credits for prepaid royalties.

We therefore think this case is distinguishable from *Weyher v. Commissioner, supra.* In *Weyher,* the taxpayer sold a piece of real property encumbered by an installment obligation, the interest on which the taxpayer had prepaid and deducted from his income. We held that a portion of the selling price constituted reimbursement for the unaccrued prepaid interest and that under the tax benefit rule such reimbursement had to be returned to income when received. Here there was no sale of an intangible asset created by a previous deduction. Because 1966 is not before us, we are not asked to decide whether petitioner's contributing his rights to credits to the partnership in 1966 created income. See generally *Nash v. United States, supra; United States v. Davis,* 370 U.S. 65 (1962). Nor has either party suggested that Cumberland acquired any basis in these credits at that time. See generally *Tennessee Carolina Transportation, Inc. v. Commissioner,* 65 T.C. 440 (1975), affd. per curiam 582 F.2d 378 (6th Cir. 1978), cert. denied 440 U.S. 909 (1979); sec. 1.612–1(b)(1)(i), Income Tax Regs.

If petitioner had, himself, subleased these leases to a mining operator, his net coal royalty income would be treated as capital gain under section 631(c). The amount of his net coal royalties would be increased to the extent his costs were reduced by credits for advanced minimum royalties. But it is hard to see how the tax benefit rule would apply to that situation, unless petitioner was deemed to have reimbursed himself. Interposing the partnership as the sublessor should not change the result in this case, where petitioner was reimbursed only by way of a special allocation of royalty income.

---

[21]In terms of partnership taxation, we find that neither sec. 707(a) (payments made to partners other than in their capacity as partners) nor sec. 707(c) (payments made without regard to partnership income) applies in this situation. See *Pratt v. Commissioner,* 64 T.C. 203 (1975), affd. in part and revd. in part on other grounds 550 F.2d 1023 (5th Cir. 1977); *Ragner v. Commissioner,* 34 T.C. 111 (1960).

By treating the income and expenses of a sublessor under sections 272, 631(c), and 1231, Congress has enacted a scheme under which net losses in lean years result in ordinary deductions, and net gains in profitable years result in capital gains. Ordinary deductions for advanced minimum royalties taken under section 612 rather than section 631(c) of the Code should not alter section 631(c) treatment of net profits as capital gains in later years. See also sec. 1.612–1(b)(1)(i), Income Tax Regs. In other words, petitioner's reporting capital gains on specially allocated coal royalties is not "an event inconsistent with what has been done in the past." *Estate of Block v. Commissioner*, 39 B.T.A 338, 341 (1939), affd. sub nom. *Union Trust Co. v. Commissioner*, 111 F.2d 60 (7th Cir.), cert. denied 311 U.S. 658 (1940).

What respondent is really trying to accomplish in this case, although he cites no authority, is to *recharacterize* income treated as capital gain under section 1231. Cf. *Merchants National Bank of Mobile v. Commissioner, supra; First National Bank of Lawrence County v. Commissioner, supra.* See also *Arrowsmith v. Commissioner*, 344 U.S. 6 (1952). However, in analogous situations, Congress has consistently enacted legislation to override section 1231 where deductions generated by property used in a trade or business are recovered through a sale of the property at capital gains rates. See, e.g., secs. 1245, 1250, 1251, etc. See generally sec. 751(c)(2). With respect to depreciation recaptured under sections 1245 and 1250, we have stated: "Obviously, neither Congress nor the Treasury believed that respondent possessed adequate means to prevent taxpayers from converting ordinary income into capital gain prior to the enactment of this legislation." *Macabe Co. v. Commissioner*, 42 T.C. 1105, 1117 (1964). Accord, *Fribourg Nav. Co. v. Commissioner*, 383 U.S. 272 (1966). Thus far, legislation recharacterizing section 631(c) capital gain has been limited to the recapture of certain mining exploration expenditures under sections 617(d) and 617(f)(3).

For the above reasons, we hold the tax benefit rule does not apply in this case.

Respondent alternatively argues that at least a portion of the royalties in question should be treated as ordinary dividend income to petitioner because a part of the payments were "legally due" Davis Coals, petitioner's controlled corporation.

This assertion is without foundation in the record. Under the terms of the joint venture agreement, Cumberland was obligated only to petitioner. If Davis Coals can be said to have surrendered to petitioner any rights to credit for advanced royalties, it did so in 1966, a year not before the Court, at the time petitioner transferred the leases to Cumberland. We therefore reject this argument as well.

Since we have found that petitioner correctly treated the income in question as specially allocated coal royalties, what follows is straightforward. Section 702(a)(3)[22] requires each partner to include in income his distributive share of the partnership's section 1231 gains and losses. Sections 704(a) and 704(b)[23] provide that specific items of partnership income, gain, loss, deduction, or credit may be allocated among the partners differently from their general partnership shares of income and loss, as long as the partnership agreement so provides and the purpose of the allocation is not merely to avoid taxes. *Orrisch v. Commissioner*, 55 T.C. 395 (1970), affd. per curiam without published opinion (9th Cir. 1973 31 AFTR 2d 73–1069); *Kresser v. Commissioner*, 54 T.C. 1621 (1970). Since section 631(c) coal royalties constitiute income taken into account under section 1231, such royalties may be specially allocated within the limitations of section 704(b).

Section 704(b)(1) requires that any special allocation be part of the partnership agreement. Sec. 1.704–1(a), Income Tax Regs.

---

[22]SEC. 702. INCOME AND CREDITS OF PARTNER.

(a) GENERAL RULE.—In determining his income tax, each partner shall take into account separately his distributive share of the partnership's—

\* \* \* \* \* \* \*

(3) gains and losses from sales or exchanges of property described in section 1231 (relating to certain property used in a trade or business and involuntary conversions),

[23]SEC. 704. PARTNER'S DISTRIBUTIVE SHARE.

(a) EFFECT OF PARTNERSHIP AGREEMENT.—A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this section, be determined by the partnership agreement.

(b) DISTRIBUTIVE SHARE DETERMINED BY INCOME OR LOSS RATIO.—A partner's distributive share of any item of income, gain, loss, deduction, or credit shall be determined in accordance with his distributive share of taxable income or loss of the partnership, as described in section 702(a)(9), for the taxable year, if—

(1) the partnership agreement does not provide as to the partner's distributive share of such item, or

(2) the principal purpose of any provision in the partnership agreement with respect to the partner's distributive share of such item is the avoidance or evasion of any tax imposed by this subtitle.

This requirement is satisfied here because we have found that the partnership agreement, both on its face and as applied by the parties, allocated to petitioner a portion of the earned royalties Cumberland received for coal mined under the Palmer Bros., Early, and Trader leases. See *Boynton v. Commissioner,* 72 T.C. 1147 (1979); *Holladay v. Commissioner,* 72 T.C. 571 (1979); *Kresser v. Commissioner, supra.*

Section 704(b)(2), as interpreted by the regulations, requires every special allocation to have " 'substantial economic effect,' that is, * * * the allocation [must] actually affect the dollar amount of the partners' shares of the total partnership income or loss independently of tax consequences." Sec. 1.704–1, Income Tax Regs.[24] This limitation is satisfied here because the income allocated to petitioner was in fact paid over to him and the royalties received by Cumberland's other partners in those years were accordingly reduced. *Harris v. Commissioner,* 61 T.C. 770, 786 (1974). See *Orrisch v. Commissioner, supra; Kresser v. Commissioner, supra.*

Respondent's final argument is that even if the amounts allocated to petitioner represent a division of Cumberland's profits, petitioner is not entitled to capital gain under section 631(c) because he retained no economic interest in the assigned leases.[25] We disagree.

Respondent's argument misconstrues fundamental principles of partnership taxation. Section 702(b) states:

> The character of any item of income, gain, loss, deduction, or credit included in a partner's distributive share under paragraphs (1) through (8) of subsection (a) shall be determined as if such item were realized directly from the source from which realized by the partnership, or incurred in the same manner as incurred by the partnership.

This language has been consistently interpreted to mean that the character of partnership income is determined at the partnership level. Sec. 1.702–1(b), Income Tax Regs.; *Podell v. Commissioner,* 55 T.C. 429 (1970); *Grove v. Commissioner,* 54 T.C. 799 (1970). See sec. 703(a); *United States v. Basye,* 410 U.S.

---

[24]The "substantial economic effect" requirement of the regulations is now codified in sec. 704(b)(2). Tax Reform Act of 1976, sec. 213(d), Pub. L. 94–455, 90 Stat. 1520, 1548.

[25]See also sec. 1.631–3(b)(4)(ii), example (*3*) Income Tax Regs. (taxpayer who has an economic interest, but who does not dispose of coal under contract, does not qualify under sec. 631(c)).

441 (1973); *Resnik v. Commissioner*, 66 T.C. 74 (1976), affd. per curiam 555 F.2d 634 (7th Cir. 1977). Because Cumberland was the sublessor of the assigned leases, Cumberland's net income from these leases is taxed under sections 631(c) and 1231. Accordingly, Cumberland's partners must each report their distributive shares of this income under section 702(a)(3). Sec. 1.702–1(a)(3), Income Tax Regs.

We therefore hold petitioner is entitled to report under sections 631(c) and 1231 those amounts of coal royalty income specially allocated to him under the joint venture agreement. It follows that petitioner properly reported such partnership income in the years it was received by Cumberland. Sec. 706(a).[26] See *United States v. Basye, supra*. Cumberland's disbursement of petitioner's 1967 allocation to him in 1968 does not change this result.

We recognize that our disposition of this issue will result in petitioner's reporting capital gain on net coal royalties in 1967, while Cumberland's other partners, provided they have no other section 1231 gains, will be entitled to deduct ordinary losses in that year under sections 272, 631(c), and 1231. Coal under sublease actually mined in 1967 produced a profit, part of which profit was allocated to petitioner. Payments made on inactive properties, however, resulted in a net loss for the year with respect to partners other than petitioner.[27]

No "ceiling" rule, sec. 1.704–1(c)(2)(i), Income Tax Regs.; Rev. Rul. 75–458, 1975–2 C.B. 258 (in effect applying a "ceiling" rule to sec. 704(b) special allocations), has been violated by this result. The "ceiling" rule set forth in section 1.704–1(c)(2)(i), Income Tax Regs., provides generally that gains or losses not actually realized by the partnership with respect to contributed property may not be specially allocated. See also sec. 703(a). However, it is quite clear that income or loss with respect to particular partnership assets may be specially allocated under section

---

[26]SEC. 706(a). YEAR IN WHICH PARTNERSHIP INCOME IS INCLUDABLE.—In computing the taxable income of a partner for a taxable year, the inclusions required by section 702 and section 707(c) with respect to a partnership shall be based on the income, gain, loss, deduction, or credit of the partnership for any taxable year of the partnership ending within or with the taxable year of the partner.

[27]This result follows from respondent's concession in this case that advanced minimum royalties paid by a sublessor on unmined properties may be taken into account when paid under sec. 1231. See n. 17 *supra*.

704(a) and (b), as well as section 704(c)(2). Sec 1.704–1(b)(2), examples *(1)–(4)*, Income Tax Regs.; Rev. Rul. 75–458, *supra.* Such is the case here, and nothing in the record suggests that unrealized gains or losses were allocated under Cumberland's joint venture agreement.

## *Issue 3*

The final issue for decision is whether petitioner Joe Davis realized income by reason of his gifts of stock in trust where such gifts were conditioned upon the trustee's agreed payment of the resulting Federal and State gift taxes. The facts and legal question presented herein are indistinguishable from those in *Estate of Henry v. Commissioner*, 69 T.C. 665 (1978), appeal filed (6th Cir., May 5, 1978). We continue to adhere to our position in *Henry* and therefore hold that petitioner did not realize taxable income as a result of his gifts in trust because of the trustee's payment of gift taxes imposed. *Bradford v. Commissioner*, 70 T.C. 584, appeal filed (6th Cir., Dec. 26, 1978); *Hirst v. Commissioner*, 63 T.C. 307 (1974), affd. 572 F.2d 427 (4th Cir. 1978); *Turner v. Commissioner*, 49 T.C. 356 (1968), affd. 410 F.2d 752 (6th Cir. 1969).

To reflect concessions and the foregoing,

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

NIMS, *J.,* concurring: I agree with and concur in the majority opinion. In the words of Judge Hufstedler, speaking for the Ninth Circuit in a somewhat analogous situation, "Congress did not create the lacuna through which the taxpayer has tried to leap." *United States v. Regan*, 410 F.2d 744, 745 (9th Cir. 1969). The taxpayer there had argued that Congress intended to give taxpayers in her position not only the benefit of capital gains treatment of the income derived from cutting timber, but also the extra tax dividend of deductibility of expenses incurred in reaching the timber. Here, the taxpayer sought capital gains on the sale of coal and deductibility of the cost of the coal.

In the case before us, section 631(c) expressly provides that "the word 'owner' means any person who owns an economic

interest in coal or iron ore in place, *including a sublessor.*" (Emphasis added.) Cumberland was a sublessor. Section 631(c), like section 631(b) in the case of timber, measures gain on disposal of the asset (in this case coal) by "the difference between the amount realized from the disposal of such coal * * * and the adjusted depletion basis thereof plus the deductions disallowed for the taxable year under section 272." The section provides that such gain is capital gain.

As explained in *Regan,* to find the definition of "adjusted depletion basis" one must pursue a clutch of related Code sections. Section 612 tells us that the basis on which depletion is to be allowed is provided in section 1011. Section 1011 says that basis is cost (sec. 1012) subject to adjustments as provided in section 1016. Section 1016 requires that "proper adjustment * * * be made—(1) for expenditures * * * properly chargeable to capital account." 410 F.2d at 746. Section 1.631–2(b)(2), Income Tax Regs., then requires that "The depletion unit of coal or iron disposed of shall be determined under the rules provided in the regulations under section 611, relating to cost depletion."

Further paraphrasing the *Regan* court's language, when all of the pieces are pasted together, we can see that section 631(c) contains a direction to subtract capital expenditures, i.e., cost, from the amount realized to determine the capital gain.

Are the royalties which Cumberland paid to the landowners capital expenditures? I think they are. The royalties are directly related to the acquisition and disposal of the coal and should be offset against capital gains realized on the disposal of the coal. For this reason, the majority properly denies the claimed deduction for royalties paid and requires, instead, their inclusion in adjusted depletion basis.

In addition, I would like to point out that the adjusted depletion basis determined by the Commissioner—the amount of royalties paid and sought to be deducted by Cumberland—is consistent with the regulations under sections 631(c) and 611.

The method of allocation of costs to the units disposed of in a given year, pursuant to sec. 1.611–2(a), Income Tax Regs., is reflected in the following formula:

$$\frac{\text{Adjusted basis}}{\text{Units of mineral remaining at end of year + units sold in taxable year}} \times \frac{\text{Units sold in}}{\text{taxable year}}$$

In order properly to allocate a proportionate part of the adjusted depletion basis to the units of coal sold in a given taxable year, the total cost of all coal purchased and included in the numerator of the above fraction must directly correspond to the total units included in the denominator. It offends logic, and would be grossly unfair to petitioner, to suggest that a single year's cost may be reflected in the numerator, whereas the coal to be acquired in the current and all future years must be included in the denominator.

For example, Cumberland paid "earned" royalties of $10,723.51 during 1967 and it is assumed that these royalties were paid at the rate of 10 cents per ton. Cumberland therefore in effect sold 107,724 tons of coal to Webster during that year. Applying the formula to these facts, the adjusted depletion basis of the coal disposed of in 1967 was $10,724, determined as follows:

$$\frac{\$10,724}{\text{-0- plus } 107,240 \text{ tons}} \times 107,240 \text{ tons} = \$10,724$$

(The denominator includes only the units of mineral purchased with the $10,724 earned royalties paid in 1967; i.e., the 107,240 tons sold during the year. Whatever reserves remained on the landowners' property, and for which no payment had yet been made, cannot be said to have been "acquired" by Cumberland until later mined.)

It will be observed that the same result would be reached by applying the example at sec. 1.631–3(b)(3)(ii)(*b*), Income Tax Regs. The adjusted depletion basis, so determined, also exactly equals the amount of earned royalty for which a deduction is sought. Of course, if Cumberland had incurred other costs disallowed as current deductions under section 272, such costs would properly be added to the numerator of the fraction, thereby proportionately decreasing taxable capital gain.

FAY and CHABOT, *JJ.*, agree with this concurring opinion.

HALL, *J.*, concurring in part and dissenting in part: While I concur in the remainder of the majority opinion, I respectfully dissent from so much of the opinion as holds that section 631 mandates the disallowance of deductions for royalties paid by a

lessee under a mineral lease before it is subleased or there is any agreement to sublease it. As the majority opinion points out, the statutory scheme grants to the lessor capital gains treatment on the profitable sale of coal in which he has an economic interest, but what would otherwise be his ordinary deductions are converted by section 272 into a setoff against his gain. A lessee, on the other hand, does not enjoy capital gains treatment but retains his normal deductions. Naturally, this raises the question of the taxpayer who is both lessee and, by virtue of a sublease, lessor. The statutory answer, explained in regulations section 1.631–3(b)(3)(ii)(a), is that he is treated as a lessor. The difficulty I have with the majority opinion is its construction of the statute as authorizing the disallowance of deductions earned while petitioner was a lessee but *not* yet a lessor, simply because of his subsequent entry into a sublease, albeit pursuant to his normal business practice. In the absence of a very clear statutory mandate, or at the least a regulation, to the contrary, I do not think we should permit subsequent events retroactively to reverse a deduction which was clearly allowable on the facts existing at the moment it was originally earned. The introduction of hindsight criteria for deductibility is unnecessary, is highly unusual, and in the chance case of the intervention of the end of a taxable year between the payment and the subsequent sublease, would fall afoul of the annual accounting period concept. Of course, if there were evidence of artificial manipulations to take inappropriate advantage of these statutory provisions, other issues would be presented which are not involved here and which we do not presently need to decide. But on the present record, I would allow deductions for amounts paid by Cumberland as lessee before it subleased to Western Coal. It was Cumberland's practice to execute subleases in due course, but there is no finding of any contractual obligation to do so. At the moment the royalty payment was made, Cumberland was not yet a sublessor and I see no warrant in the statute or regulations for treating it as if it were.

TANNENWALD, *J.*, dissenting: While I am not disposed fully to accept Judge Goffe's analysis in his dissenting opinion, I am in agreement with his conclusion that the respondent's regulation

(sec. 1.631–(b)(3)(ii)(*a*), Income Tax Regs.) is not within the ambit of section 631 and is therefore invalid. The regulation apparently rests upon the proposition that the provision for capital gains treatment by lessors of coal interests is sufficient to justify the denial of ordinary expense treatment to payments by a lessee of coal interests (which is generally accorded to royalty payments by a lessee under section 162) merely because such lessee also happens to be a sublessor. In my judgment, that condition is insufficient to justify respondent's attempt by regulation to cure the lack of symmetry in the statutory scheme. The fact that subsection (c) of section 631 defines "owner" to include a "sublessor" is too thin a reed upon which to sustain respondent's regulation. That definition appears to have been included simply for the purpose of assuring that a sublessor would receive capital gains treatment. I am reinforced in this conclusion by the fact that the subsection also makes clear that deductions for royalties are to be determined without regard to its provisions. I also note the fact that the majority had no difficulty in refusing to stretch the tax benefit rule in order to cure an asymmetrical result whereby petitioner reported sums as capital gains which, in every real sense, represented amounts which had properly been deducted as ordinary expenses in previous years. Compare *Fribourg Navigation Co. v. Commissioner*, 383 U.S. 272 (1966), where, in another context, the Supreme Court refused to sustain respondent in an attempt to remedy asymmetry in the statutory scheme relating to the deduction for depreciation in the year of sale and gain from the sale of depreciated property.

STERRETT, *J.*, agrees with this dissenting opinion.

GOFFE, *J.*, dissenting: I respectfully dissent. Section 631(c) and related provisions of the Internal Revenue Code, as well as an established body of case law, mandate a holding in petitioners' favor on the first issue in this case. I dissent for the following separate and distinct reasons:

(1) The treatment of royalties paid by Cumberland to the coal owners, as approved by the majority and reflected in the example in section 1.631–3(b)(3)(ii)(*b*), Income Tax Regs., is incorrect and inconsistent with section 631 of the Internal

Revenue Code and the body of section 1.631–3(b)(3)(ii)(*a*), Income Tax Regs., and,

(2) The body of section 1.631–3(b)(3)(ii)(*a*), Income Tax Regs., is invalid because it is contrary to section 631 of the Internal Revenue Code, is unsupported by legislative history, and is contrary to the generally accepted principles of taxation of natural resources.

## I. *Background*

The law regarding the tax treatment of royalties paid and received in a mineral lease transaction is well settled. It was long ago held that the dominant characteristic of a mineral lease transaction is the acquisition by the lessee of the privilege of exploiting the lessor's land for the production of minerals and that the passage of title to the minerals was incidental to the transaction. *Burnet v. Harmel,* 287 U.S. 103 (1932). Thus, payments made pursuant to the lease are in the nature of rent. As such, they are generally deductible by the lessee under section 62(5) and either section 162(a)(3) or section 212, and are includable in the lessor's gross income. The traditional treatment of royalties paid to a lessor is that they are taxable income subject to depletion. *Palmer v. Bender,* 287 U.S. 551 (1933). Similarly, lease bonuses (amounts paid by a lessee to a lessor upon the execution of a lease, which amounts are not affected by the presence or absence of production from the leaseholds) have been characterized, with regard to the lessor, as mere advance royalties which also are includable in the lessor's taxable income subject to depletion. *Herring v. Commissioner,* 293 U.S. 322 (1934); G.C.M. 22730, 1941–1 C.B. 214. A lessee, on the other hand, though he may deduct from gross income royalties paid pursuant to a mineral lease, is required to capitalize lease bonuses paid and other costs of acquiring the lease and recover such amounts through the depletion deduction. *Canadian River Gas Co. v. Higgins,* 151 F.2d 954 (2d Cir. 1945). The fine line between installment bounuses and advanced royalties paid by a lessee must often be drawn, because bonus payments must always be capitalized, while advanced royalties may be deducted, at the option of the lessee, either when paid or when the mineral product in respect of which the advanced royalties were paid or accrued is sold. Sec. 1.612–3(b)(3), Income Tax Regs. Here, such a line need not be drawn because it has been stipulated that the

payments before us were royalties. Since on its returns the partnership elected to deduct such royalties when paid, petitioners may treat their allocable shares of such payments as royalties paid by them. Sec. 702(a)(7). It can, therefore, be seen that, absent any consideration of section 631(c), the royalties paid by Cumberland, the partnership, are clearly deductible from the gross income of its partners, and the royalties received by Cumberland would flow through to its partners as ordinary income subject to depletion. Except to the extent that section 631(c) alters this treatment, the Court is bound to compute petitioners' taxable income under the above-stated, well-settled principles of taxation of profits from extraction of natural resources.

Section 631(c) was enacted by Congress in 1951 as a relief measure for the coal industry. S. Rept. 781, 82d Cong., 1st Sess. (1951), 1951–2 C.B. 458, 488. It alters the treatment to be accorded the disposal of a mineral interest for Federal income tax purposes.[1] Focusing upon the treatment of a lessor or sublessor, section 631(c) provides that the disposal of coal as involved in this case shall be treated as a sale of coal. Section 1231(b)(2) includes coal as property used in the trade or business of the taxpayer, and thus the provisions of section 1231(a) and

---

[1]Sec. 631(c) provides:

(c) DISPOSAL OF COAL OR DOMESTIC IRON ORE WITH A RETAINED ECONOMIC INTEREST.—In the case of the disposal of coal (including lignite), or iron ore mined in the United States, held for more than 6 months before such disposal, by the owner thereof under any form of contract by virtue of which such owner retains an economic interest in such coal or iron ore, the difference between the amount realized from the disposal of such coal or iron ore and the adjusted depletion basis thereof plus the deductions disallowed for the taxable year under section 272 shall be considered as though it were a gain or loss, as the case may be, on the sale of such coal or iron ore. Such owner shall not be entitled to the allowance for percentage depletion provided in section 613 with respect to such coal or iron ore. This subsection shall not apply to income realized by any owner as a co-adventurer, partner, or principal in the mining of such coal or iron ore, and the word "owner" means any person who owns an economic interest in coal or iron ore in place, including a sublessor. The date of disposal of such coal or iron ore shall be deemed to be the date such coal or iron ore is mined. In determining the gross income, the adjusted gross income, or the taxable income of the lessee, the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of this subsection. This subsection shall have no appliction, for purposes of applying subchapter G, relating to corporations used to avoid income tax on shareholders (including the determinations of the amount of the deductions under section 535(b)(6) or section 545(b)(5)). This subsection shall not apply to any disposal of iron ore—

(1) to a person whose relationship to the person disposing of such iron ore would result in the disallowance of losses under section 267 or 707(b), or

(2) to a person owned or controlled directly or indirectly by the same interests which own or control the person disposing of such iron ore.

section 631(c) allow capital gain or ordinary loss treatment. As an offset to the advantage of reporting coal royalty income at capital gains rates, Congress removed the traditional tax benefit given lessors and sublessors, percentage depletion under section 613. Thus, instead of allowing lessors and sublessors to exhaust the basis of a mineral interest by offsetting ordinary income from mineral royalties with a depletion deduction each year, the cost basis of a mineral interest is offset against the amount realized upon the disposition of the interest.

In the instant case, for some unexplained reason, Cumberland claimed no deduction or offset for an aliquot part of adjusted depletion basis. Perhaps it was error on the part of Cumberland or perhaps Cumberland had no costs in acquiring the coal leases or development costs. As will be demonstrated below, however, the body of the regulations treats the royalties paid by Cumberland as costs to be recovered against the coal disposed of, a treatment contrary to the example in the regulations which the Commissioner employed and which the majority of the Court approves.

The Commissioner, in his statutory notices of deficiency, adjusted the income and deductions reported by Cumberland with the following explanation: "It is determined that the expenses claimed for advance and earned royalties paid are part of the cost of coal disposed of during the year and, as such, are deductions from capital gain income instead of being deductions from ordinary income as claimed in the partnership returns."

## II. *Treatment by Commissioner in Statutory Notice and Approval by Majority of the Court*

The Commissioner adjusted the income of Cumberland (and the shares of its income to its partners) by disallowing Cumberland's deduction for royalties paid to the owners of the coal and, instead, allowing the royalty payments only as offsets to the royalty income received by Cumberland from Webster Coal. The Commissioner's determination conforms to the example under section 1.631–3(b)(3)(ii)(*b*), Income Tax Regs., but that determination is inconsistent with the Code and the body of the regulations and, therefore, invalid. The regulations (not the example) do not provide for an offset of royalties paid against royalties received but, instead, provide that royalties paid by a sublessor are added to the adjusted depletion basis of the coal.

Section 1.631–3(b)(3)(ii)(*a*), Income Tax Regs., provides as follows:

However, a lessee who is also a sublessor may dispose of coal or iron ore as an "owner" under section 631(c). Rents and royalties paid with respect to coal or iron ore dispoed of by such a lessee under section 631(c) *shall increase the adjusted depletion basis of the coal or iron ore and are not otherwise deductible.* [Emphasis added.]

The example under section 1.631–3(b)(3)(ii)(*b*), Income Tax Regs., holds as follows:

*Example.* B is a sublessor of a coal lease; A is the lessor; and C is the sublessee. B pays a royalty of 50 cents per ton. C pays B a royalty of 60 cents per ton. The amount realized by B under section 631(c) is 60 cents per ton and will be reduced by the adjusted depletion basis of 50 cents per ton, leaving a gain of 10 cents per ton taxable under section 631(c).

The fallacy of the example is that it does not consider that portion of section 631(c) of the Code which prescribes fixing the amount of gain from the sale of coal as "the difference between the amount realized from the disposal of such coal or iron ore and the adjusted basis *thereof,* plus the deductions disallowed for the taxable year under section 272." (Emphasis added.)

Likewise, the body of the regulations repeats the language of the Code as follows:

The difference between the amount realized from the disposal of the coal or iron ore in any taxable year, and the adjusted depletion basis *thereof* plus the deductions disallowed for the taxable year under section 272, shall be gain or loss upon the sale of the coal or iron ore. [Sec. 1.631–3(a)(1), Income Tax Regs. Emphasis added.]

By overlooking the term "thereof" in the language quoted above, respondent has resorted in the example to an offset concept which has no support in the law or regulations instead of adding the disallowed deduction to basis to be recovered ratably from the adjusted depletion basis over the useful life of the depleting natural resource. The term "thereof" recognizes that only a portion of the adjusted depletion basis is offset against income in the current year; i.e., that portion which relates to the coal that was sold. I know of no area in the tax law where an item is disallowed as an ordinary deduction, is added to basis and the entire basis of the asset sold, and the asset retained is offset against the gain realized from the sale of only part of the asset. It is a cardinal rule in the tax law that when one sells part of an asset one may offset against the gain from that sale only that

portion of the cost basis relating to what was sold. But the Commissioner did not do that in his example or in his determination of Cumberland's net income. Yet, in his statutory notices of deficiency (language quoted in full above), he determined that the royalties paid by Cumberland were "part of the cost of coal disposed of."

Section 631(c) of the Code and the regulations prohibit the allowance of percentage depletion but they do not prohibit the recovery of costs nor should they do so. Section 631 merely changes the character of the proceeds realized from the sale of coal from ordinary income to capital gain. It neither prohibits nor changes the rule for allowing the owner to recover the basis of what was sold by offsetting it against the selling price. The denial of percentage depletion is required because it is based upon a percentage of proceeds from sale of the mineral, not its cost to the owner.

"The depletion unit of coal or iron ore disposed of shall be determined under the rules provided in the regulations under section 611, relating to cost depletion." Sec. 1.631–3(b)(2), Income Tax Regs.

Cost depletion of coal under section 611 and the regulations thereunder is computed as follows:

$$\frac{\text{Total cost basis}}{\text{Units of mineral at end of taxable year + units of mineral sold in taxable year}} \times \begin{array}{l}\text{Number of units} \\ \text{of mineral sold} \\ \text{in taxable year}\end{array} = \text{Cost depletion for year}$$

Sec. 1.611–2(a)(1) and (a)(3), Income Tax Regs.

The error of the Commissioner's determination in this case and the same error contained in the example in his regulations can best be illustrated by a hypothetical. The record in the case is not complete enough to show all the ingredients necessary for applying the regulations such as the number of units expected to be mined; therefore, let me propose the following hypothetical which is within the realm of reason of all the facts. Further, because advance royalties complicate the computations, I shall use only the "earned"[2] royalties for the taxable year 1967.

In the taxable year 1967, Cumberland paid "earned royalties"

---

[2]"Earned royalties" is a term used in the Cumberland-Webster Coal subleases. It is a term not used in the tax law and for good reason. Royalties are not "earned" but are, instead, received by reason of disposition of the mineral.

to the owners of the coal deposits aggregating $10,723.51. Assume that all of the royalties were paid pursuant to the lease provision of 10 cents per ton (and not to the greater of the advance minimum royalty or 10 cents per ton because such facts cannot be determined from the record). It can be assumed, therefore, for purposes of these computations, that because Cumberland paid 10 cents per ton to the owners of the coal, that Webster Coal mined 107,235 tons of coal. Assume, further, that pursuant to all of the leases, Webster Coal paid Cumberland 30 cents per ton (instead of the possible 8½ percent of gross sales price because such facts cannot be determined from the record). That would mean that Webster Coal paid royalties to Cumberland in 1967 in the amount of $32,171 (107,235 tons x $0.30 per ton). Assume, further, that the coal reserves aggregated 1 million tons before the operations began in 1967.

The following computations reflect (1) how the Commissioner treated the royalties paid by Cumberland pursuant to the example in the regulations and approved by the majority of the Court; (2) how the body of the regulations provide for such treatment; and (3) how Cumberland treated the royalty payments.

(1) *Treatment by Commissioner, Example in the Regulations,
and Majority of the Court*

Royalties received from sales of coal ..................................... $32,171
Less royalties paid by Cumberland to coal owners.................. 10,724
Long-term capital gain to be reported by partners.................... 21,447

(2) *Treatment Pursuant to Body of the Regulations*

$$\frac{\begin{array}{c}\$10,724 \\ \text{(royalties paid by Cumberland)}\end{array}}{\begin{array}{c}1,000,000 \text{ tons} \\ \text{(coal reserves at beginning of 1967)}\end{array}} \times \begin{array}{c}107,235 \text{ tons} \\ \text{(coal mined in 1967)}\end{array} = \$1,149$$

Royalties received from sales of coal ..................................... 32,171
Less aliquot part of royalties paid by Cumberland
characterized as "adjusted depletion basis" ........................ 1,149
Long-term capital gain to be reported by partners.................... 31,022

### (3) *Computation Made by Cumberland*

Royalties received from sales of coal reported
  in full by partners ..................................................... $32,171
Royalties paid by Cumberland, allowed in full as
  deductions by the partners .............................................. 10,724

It is readily apparent that the computations made by the Commissioner in his statutory notices of deficiency pursuant to the example in the regulations and approved by the majority of the Court produce a lower income tax liability than a computation made pursuant to the body of the regulations. This may explain why the regulations have remained unchallenged for such a long period of time; i.e., if upheld, the taxpayers would have more to lose.

Because the majority of the Court adopts the computations made by the Commissioner pursuant to the example of the regulations, it is disapproving the computation prescribed by the body of the regulations, yet it sustains the validity of the regulations.

If the body of the regulations is valid (a point addressed in III below) the percentage of the royalties paid by Cumberland will vary from year to year because the reserves of coal fluctuate with the acquisition of additional leases, and the number of tons of coal mined each year fluctuates. If the body of the regulations is valid, this is obviously the correct manner in which to treat the royalties paid by Cumberland; i.e., an aliquot part of the adjusted depletion basis.

If, instead, the majority disapproved the treatment of the royalties paid made by the Commissioner and approved the treatment prescribed by the body of the regulations, the resulting deficiencies in income tax would exceed those determined by the Commissioner in his statutory notices of deficiency.

From the explanation and examples provided above, it can be seen that the body of section 1.631–3(b)(3)(ii)(*a*), Income Tax Regs., is plainly inconsistent with the example used to illustrate it. The Commissioner and the majority have follwed the example rather than the body of the regulations, but neither has faced up to the distasteful reality that if the example correctly states the application of the law, then the body of the regulations is invalid. Because the validity of the regulations is at issue in this case, there is no excuse which allows us to ignore the plain

internal inconsistency of the regulations. Having carefully examined the competing methods of computation under the regulations, I conclude that the treatment of the royalties paid by Cumberland approved by the majority of the Court (under the example in the regulations) is erroneous because it is inconsistent with the Internal Revenue Code and body of the regulations and is unsupported by any statute, rule of law, or regulation.

### III. *Treatment Under Body of Sec. 1.631–3(b)(3)(ii)(a), Income Tax Regs.*

Section 631(c) of the Code contains the following provisions: "In determining the gross income, adjusted gross income or the taxable income of the lessee, the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of this subsection."

That section also provides that a sublessor owns an economic interest in the coal and is, therefore, entitled to the benefits of section 631 in reporting its royalty income.

By regulation, the Commissioner, contrary to the admonition in the Code quoted above, denies to a sublessor the deduction for royalties paid which he could unquestionably deduct as a lessee. He performs this unwarranted surgery on the sublessor's deduction for royalty payments in section 1.631–3(b)(3)(ii)(a), Income Tax Regs.:

However, a lessee who is also a sublessor may dispose of coal or iron ore as an "owner" under section 631(c). Rents and royalties paid with respect to coal or iron ore disposed of by such a lessee under section 631(c) shall increase the adjusted depletion basis of the coal or iron ore and are not otherwise deductible.

The majority of the Court finds this portion of the regulations valid although, of course, the Commissioner did not apply it in this case, and it is inconsistent with the example in the regulations which the Commissioner applied to Cumberland and of which the majority approves.

Before Cumberland subleased the coal lands to Webster Coal it was a lessee, and its deductions for royalties paid to the owners of coal lands would be deductible under section 162(a)(3) of the Code and, furthermore, because section 631(c) of the Code prohibits any adjustments to the lessee's deductions. It has paid the royalties to the land owners by virtue of its role as a lessee.

When Cumberland subleased the coal properties to Webster Coal, it continued to pay royalties to the land owners as the lessee under the leases. It became a sublessor and it *received* royalties from Webster Coal only in the role of sublessor.

The majority, in effect, holds that a sublessor is not a lessee. But a sublessor is a lessee. A sublease contemplates a reversion but an assignment does not. *Murphy v. Reynolds,* 31 Tenn. App. 94, 212 S.W.2d 686 (1948). None of the leases involved here were assigned. Instead, the lessee (Cumberland) and Webster Coal entered into subleases. The subleases contain no consent of the landowners; therefore, the subleases did not relieve the lessee (Cumberland) of its obligation under the primary leases when it became a sublessor. Accordingly, as a matter of law, Cumberland continued to be a lessee after it became a sublessor. A sublease cannot be supported without a lease. The term "sublessor" implies the existence of a primary lease. Indeed, the majority holds that Cumberland, in effect, ceased to be a lessee before it subleased the properties because it never intended to nor did it ever engage in mining operations and because all of the leases were at some time assigned, proving somehow that a single transaction transpired. Although the majority, in its opinion, attributes this intent to Cumberland, it makes no such finding of fact, and because the case was fully stipulated, the record will not support such a finding.

The majority, in denying the royalty-paid deduction to Cumberland because it is a sublessor, overlooks the fact that the regulations recognize Cumberland as a lessee. Section 1.631–3(b)(3)(ii)(*a*), Income Tax Regs., quoted above describes a sublessor as "such a lessee." But if a sublessor is still a lessee, its deductions cannot be changed because of the prohibition of section 631 of the Code quoted above.

Section 631(c) of the Code was enacted by Congress to provide special relief to recipients of coal royalties as it had previously aided the owners of timber lands. S. Rept. 781, 82d Cong., 1st Sess. (1951), 1951–2 C.B. 458, 488. It was designed to afford the owners of coal deposits capital gain treatment from the disposition of the coal. Of course, Cumberland is a recipient of coal royalties.

In *Union Bag-Camp Paper Corp. v. United States,* 163 Ct.Cl. 525, 325 F.2d 730 (1963), the Commissioner attempted to compel the taxpayer to offset its forest management expenses against

its proceeds from the sales of timber instead of allowing them as ordinary deductions. The scheme of taxation of proceeds from the sales of coal is patterned after the scheme for the taxation of the proceeds from the sale of timber. The Commissioner, in *Union Bag-Camp Paper Corp. v. United States*, attempted to do what he attempts to do here; i.e., convert deductions, which the taxpayer traditionally enjoyed as ordinary deductions before relief legislation, into offsets to the selling price. The Court of Claims rejected the Commissioner's attempt. Portions of the language of the opinion in that case are applicable here because of the identical situation.

The history of the tax law in this area shows with reasonable clarity that selling expenses, such as those involved here, are properly deductible from gross income and are not requred to be restricted to an offset against contract proceeds. There can be little doubt that, prior to 1944, a taxpayer *engaged in the business of buying and selling of timber* (such as plaintiff) was required to report the proceeds from timber sales as ordinary income and was entitled to deduct all ordinary and necessary expense attributable to such sales under section 23(a) of the 1939 Code. The tax treatment is the same today with respect to *outright* sales by owners holding their timber primarily for sale to customers in the ordinary course of trade or business. * * *

When sections 117(k) (1) and (2) were added to the 1939 Code by the Revenue Act of 1943 (58 Stat. 46), all timber owners, including dealers, became entitled to capital gains treatment where they either cut timber for use in their business (section 117(k) (1)) or sold it to others but with a retained economic interest (section 117 (k) (2)). * * * These statutory provisions, designed by Congress "to afford relief to timber owners," (Boeing v. United States, supra, at page 584 of 98 F.Supp. at p. 25 of 121 Ct. Cl.) contain nothing which on any normal reading would prohibit the deduction by a timber dealer from income of his ordinary and necessary expenses incurred in the growing or selling of his timber, or which would require him to offset such expenses against capital gains realized on timber sales or disposals.

This Congressional omission is highly significant for two reasons. In the first place, in other situations when Congress has desired to restrict a relief provision by disallowing deduction of related expenses, it has done so by express language. Thus, when section 117(j)(3) of the 1939 Code was added by the Revenue Act of 1951, in order to provide for the realization of capital gain on the sale of a growing crop together with the land on which it is situated, section 24(f) was simultaneously added to prohibit the deduction of the expenses of growing such crop. In the second place, during its consideration of legislation which ultimately became the 1954 Code, the House of Representatives passed a provision which would have specifically denied a deduction for the type of expenses here involved. Sec. 272, H.R. 8300, 83d Cong., 2d Sess; see also H. Rept. No. 1337, 83d Cong., 2d Sess., pages A67–A68. However, the Senate Finance Committee eliminated this provision with respect to timber, and the Senate's action was accepted by the Conference Committee. S. Rept.

No. 1622, 83d Cong., 2d Sess., p. 229 (1954); H. Rept. No. 2543, 83d Cong., 2d Sess., p. 33 (1954). [163 Ct.Cl. at 546–548, 325 F.2d at 742–743; fn. ref. omitted.]

The Court of Claims, sitting en banc, has more recently reaffirmed its decision in *Union Bag-Camp* in *Wilmington Trust Co. v. United States*, 221 Ct. Cl. ___ , 610 F.2d 703 (1979).

Congress specifically provided that certain deductions relating to coal mining operations would not be deductible in light of section 631 treatment of the proceeds as capital gain. See sec. 272 of the Code. It did not, however, in any way direct that the royalties paid by a lessee would no longer be deductible by him when he became also a sublessor; yet, in section 631, Congress specifically provided that a sublessor would be afforded the benefits of reporting its royalty income as capital gains.

The majority opinion, by telescoping into one transaction royalties paid by Cumberland before it became a sublessor with royalties paid after subleases were executed, provides a clue as to why it holds that Cumberland should not be entitled to the royalties-paid deduction it enjoyed prior to acquiring its additional status as a sublessor. That clue is unmistakably the relationship between Cumberland and Webster Coal. It may be argued that in the instant case Cumberland was nothing more than a passive investor. That may or may not be true because there are no facts in the record to explain why Cumberland, instead of Webster Coal, secured coal mining leases from the land owners. The record discloses no answers to the nagging "why" questions surrounding the relationship of Cumberland and Webster Coal and the business activities of each. The majority should not, however, let the relationship between the sublessor and sublessee in this case lead it to approve a rule not supported by law which will affect all sublessors, most of whom are not related to the sublessees.

A lessee who subleases his interest fulfills a very important purpose in the development of natural resources. He is a middleman or broker who puts together blocks of leases and sells them to mining operators. He may or may not engage in the actual mining operations himself, but he can hardly be called a passive investor. He is a very important link in the chain of operations from the owner of the natural resource to the ultimate consumer. Congress must have attached some importance to his function because it specifically provided in section 631(c) that he was the owner of an economic interest in the coal

and could report his royalty income at capital gains rates. There is no evidence of congressional intent to limit or deprive him of his deductions for royalties paid as deductions against ordinary income. The sublessor was specifically referred to on "his income side" in section 631(c) but not mentioned on the deduction side in section 272. There is nothing to indicate that today Congress is unwilling to confer upon owners of coal the tax benefits it provided for in section 631(c). Those benefits are derived from the entire spectrum of coal extraction, processing, and consumption. The opposite is true, however; Congress has, in the past serveral months, demonstrated a renewed emphasis on utilizing coal for the production of energy. The attempt to deny a tax benefit between related parties does not justify upholding an invalid regulation because the Commissioner of Internal Revenue contends that the law should read that way. As stated by the Supreme Court in *Calamaro v. United States*, 354 U.S. 351, 357 (1957), "Neither we nor the Commissioner are authorized to rewrite the statute simply because we may feel that the scheme it creates could be improved upon."

Regulations section 1.631–3(b)(3)(ii)(*a*) holds that royalty payments made by a sublessor are added to the sublessor's adjusted depletion basis. This is contrary to the entire body of tax law covering the production of natural resources and is not supported by congressional intent. The regulations under section 631(c) were not directed by Congress. They are interpretative, not legislative. As such, they are entitled to less weight than a legislative regulation. See *Fishman v. Commissioner*, 51 T.C. 869, 872 (1969). Because the Commissioner's interpretation of the statute expressed in these regulations adds a requirement to the statute without authority for doing so, the regulations are invalid and should not be approved. As stated by the Supreme Court in *Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129 (1936):

The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law, for no such power can be delegated by Congress, but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity. *Lynch v. Tilden Produce Co.*, 265 U.S. 315, 320–322 (1924); *Miller v. United States*, 294 U.S. 435, 439, 440 (1935) and cases cited. [297 U.S. at 134.]

.

See also *Cartwright v. Commissioner*, 411 U.S. 546 (1973); *Joseph Weidenhoff, Inc. v. Commissioner*, 32 T.C. 1222 (1959); *Parker Oil Co. v. Commissioner*, 58 T.C. 985 (1972); *Morris v. Commissioner*, 70 T.C. 959 (1978); concurring opinion of Judge Chabot in *Matheson v. Commissioner*, 74 T.C. 836 (1980). To the extent that section 1.631–3(b)(3)(ii)(*a*), Income Tax Regs., requires that royalty payments by a sublessor-lessee are to be treated as adjustments to basis rather than as deductions, the regulations are invalid. Having thus eradicated the contested regulations, I would follow the clear statutory mandate of section 631(c) and the long history of established case law and hold that petitioners are entitled to deduct the royalty payments made by Cumberland from their income under section 62(5) and either section 162(a)(3) or section 212.

Section 631(c) specifically refers to sublessors of which Cumberland is one. It specifically provides for lessees of which Cumberland is one. It makes no provision for denying a sublessor-lessee the long-standing deduction for royalties paid or requiring offset against royalty income treated as captial gain. There is not the slightest indication of congressional intent to support the regulations which reduce petitioner's deduction for royalties paid. Section 631(c) was enacted to encourage production of coal, and the effect of the invalid regulation and the holding of the majority decreases deductions of sublessors to which they have long been entitled. The regulations and holding of the majority are, therefore, contrary to the intent of Congress.

## IV. *Conclusion*

The dilemma faced by the majority of the Court in approving regulations which are internally inconsistent should be resolved by holding the regulations invalid. A regulation which attempts to add to a statute something which is not there can provide no sustenance to the statute. *United States v. Calamaro*, 354 U.S. 351, 359 (1957); *Koshland v. Helvering*, 298 U.S. 441, 446–447 (1936). As the Supreme Court stated in *United States v. Calamaro, supra,* in considering the validity of examples in Treasury regulations, "Apart from this, the force of this Treasury Regulation as an aid to the interpretation of the statute is impaired by its own internal inconsistency." (Fn. ref.

omitted.) See also *Lafayette Distributors, Inc. v. United States*, 397 F. Supp. 719 (W.D. La. 1975).

The situation here is not one where the internal inconsistency of the regulations can be resolved one way or the other because one interpretation is supported by the law or administrative interpretation. *Nico v. Commissioner*, 67 T.C. 647 (1977). Here, neither interpretation of section 631(c) of the Code is valid. The body of section 1.631–3(b)(ii)(*a*), Income Tax Regs., and the example in section 1.631–3(b)(ii)(*b*), Income Tax Regs., are not only inconsistent, both are invalid. Cumberland's deductions for royalties paid should be allowed as an ordinary deduction as mandated by section 631 of the Code.

IRWIN, WILES, and PARKER, *JJ.*, agree with this dissenting opinion.